RIEMER HESS LLC
Attorneys for Plaintiff
275 Madison Avenue, 26th Floor
New York, New York 10016
(212) 297-0700

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN DOE (a fictitious name),

                              Plaintiff,

           -against-

FIRST UNUM LIFE INSURANCE COMPANY,

                              Defendant.

Index No. xxx

**COMPLAINT**

ECF CASE

Plaintiff John Doe (a fictitious name), by his attorneys Riemer Hess LLC, complaining of unlawful conduct by Defendant First Unum Life Insurance Company ("Unum"), alleges:

1. This is an action for benefits arising under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001, et seq., and to recover prejudgment interest, attorneys' fees, and costs.

2. This Court has subject matter jurisdiction pursuant to Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331. Under Section 502(f) of ERISA, 29 U.S.C. § 1132(f), this Court has jurisdiction without respect to the amount in controversy or the citizenship of the parties.

3. Venue is proper pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), in that the breaches took place in this District and Unum resides in or may be found in this District.

### DOE'S PARTICIPATION IN THE LONG TERM DISABILITY PLAN

4. Doe is a highly accomplished, 53-year-old man who last worked as a Senior Partner at McKinsey & Company ("McKinsey") in China.

5. At all relevant times, Doe has lived in Shanghai, China.

6.   Doe's native languages include: Mandarin, Shanghainese, and Cantonese.

7.   At all relevant times, Doe was and is a participant within the meaning of Section 3(7) of ERISA, 29 U.S.C. § 1002(7), in McKinsey's group long term disability insurance plan under Policy Number LTD 451355 (the "LTD Plan"), which was underwritten by Unum.

8.   McKinsey provided Doe with long term disability insurance coverage under the LTD Plan.

9.   At all relevant times, Unum is and has been the claims administrator of the LTD Plan within the meaning of Section 3(16)(A) of ERISA, 29 U.S.C. § 1002(16)(A).

10. At all relevant times, Unum has been a fiduciary within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).

11. At all relevant times, the LTD Plan is and has been an "employee welfare benefit plan" within the meaning of Section 3(1) of ERISA, 29 U.S.C. § 1002(1).

12. Long term disability benefits under the LTD Plan have been insured by Unum.

13. The LTD Plan defines "disability" and "disabled" to mean that because of injury or sickness:

> 1. the insured cannot perform each of the material duties of his regular occupation; or
> 2. the insured, while unable to perform all of the material duties of his regular occupation on a full-time basis, is:
> > a. performing at least one of the material duties of his regular occupation or another occupation on a part-time or full-time basis;
> > and
> > b. earning currently at least 20% less per month than his indexed pre-disability earnings due to that same injury or sickness.

14. Unum determined Doe is covered as a "Class/Group: Class 1" employee.

15. The LTD Plan defines Class 1 employees as "all employees in offices designated as eligible by the Employer, including employees of Orpheus, excluding non-partner group members of the Netherlands branch and any temporary or seasonal employee."

16. Amounts of insurance for Class 1 employees are:

    a. 66 2/3% of (benefit percentage) of basic monthly earnings not to exceed the maximum monthly benefit, less other income benefits.

    b. The maximum monthly benefit is $35,000.

17. Unum determined that the LTD benefit amount that Doe would be entitled to receive if approved is $35,000.00, the maximum monthly benefit.

18. For claimants who are under the age of 60 at the time of disability, the LTD Plan defines the Maximum Benefit Period of Payment to be until the age of 65.

## DOE'S REGULAR OCCUPATION

19. Doe's Regular Occupation (hereinafter the "Occupation") was as Senior Partner for McKinsey, a global management consulting firm.

20. First Unum determined that Doe's covered earnings in his Occupation amount to $131,075.00 per month, or $1,572,900.00 per year.

21. Doe's Occupation is highly demanding and stressful.

22. The material duties of the Occupation include: work long and unpredictable hours; tolerate high levels of stress and workplace pressures; perform time-sensitive tasks; engage in constant quick decision-making; direct, control, plan, multitask, and organize effectively to meet non-negotiable deadlines; influence people in their opinions, attitudes, and judgments; engage in both written and oral communication with his 5-10 teams of up to 100 people at a time; present to large audiences; frequent travel to 2-3 cities every week; problem solving; talent development and team coaching; maintain excellent concentration and attention to detail; possess and utilize excellent memory; and technical knowledge of his field.

## DOE'S LONG TERM DISABILITY CLAIM

23. Doe applied to receive benefits from Unum under the LTD Plan on 12/9/2021, due to mixed depression disorder and anxiety disorder.

24. Unum considered, reviewed, and denied Doe's claim under the LTD Plan.

25. Unum concluded in its denial letter, dated 7/19/2022 (the "LTD Denial"), that Doe did not satisfy the definition of Disability as of 12/9/2021 through the elimination period of 6/8/2022.

26. Unum erroneously and unreasonably denied Doe's LTD benefits based on the unreliable, unsupported, and incomplete opinions of non-examining reviewers.

27. None of Unum's reviewers examined Doe in person.

28. Doe timely filed an administrative appeal of Unum's denial of benefits under the Plan by letter dated 2/7/2023 (the "Appeal").

29. On appeal, Doe submitted additional evidence demonstrating that continuously through the elimination period and on, he remains precluded from meeting the functional requirements of his Regular Occupation due to severe psychiatric symptoms.  Specifically, due to his symptoms, Doe's evidence demonstrates that he cannot: meet the high-level cognitive demands; handle stress and routine changes in a normal competitive work environment; engage in prolonged social interactions with others; and reliably complete a normal workday/workweek on a sustained and consistent basis.

30. On 5/30/2023, Unum informed Doe by letter of its decision to uphold its denial of long term disability benefits under the Plan on review (the "Final Determination").

31. Unum unreasonably relied on the unsupported opinions of biased, non-examining physicians.  These physicians unreasonably found no support for restrictions and limitations limiting Doe from performing activities consistent with his occupational demands through the elimination period, contrary to the unanimous conclusions of the medical professionals who have examined Doe.

32. The Final Determination is unreasonable and contrary to the substantial evidence submitted by all examining medical professionals including: Dr. Zhang, Dr. Yao, Dr. Talei, and Dr. van Gorp.

33. Doe exhausted all administrative remedies under the Plan.

## STANDARD OF REVIEW

34. During the claims and administrative review processes, Unum failed to comply with the Department of Labor's ("DOL") claims-procedure regulations, and its failure to comply was neither inadvertent nor harmless.

35. Upon information and belief, Unum has not adopted claim procedures in accordance with the DOL regulations.

36. By failing to strictly adhere to the DOL regulations, Unum forfeited its entitlement to any deference granted by the LTD Plan document.

37. For these reasons, this case is subject to a *de novo* review.

## UNUM FAILED TO STRICTLY ADHERE TO ERISA'S CLAIMS REGULATIONS AND FAILED TO PROVIDE DOE WITH A FULL AND FAIR REVIEW

38. Unum's administration of Doe's long term disability claim and appeal was riddled with procedural failures and errors in violation of the DOL regulations at 29 C.F.R. § 2560.503-1.

39. As a result of Unum's failure to strictly adhere to the requirements of 29 C.F.R. § 2560.503-1, Doe did not receive a full and fair review of his claim.

Unum Violated 29 C.F.R. § 2560.503-1(h)(3)(iii):

40. 29 C.F.R. § 2560.503-1(h)(3)(iii) states: "[I]n deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment ... the appropriately named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment."

41. Unum failed to strictly adhere to the mandatory requirements of 29 C.F.R. § 2560.503-1(h)(3)(iii) because it rendered a final adverse benefit determination without consulting with a qualified healthcare professional about a key piece of evidence that was submitted in support of the appeal, i.e., the report of the independent medical examination ("IME") with MMPI conducted by Bahareh Talei,

Psy.D on 5/16/2023. Dr. Talei is a U.S.-based licensed psychologist and co-founder of the Diagnostic & Counseling Center, which provides assessment, diagnosis, and psychotherapeutic treatment to patients.

42. On 3/22/2023, Unum's non-examining reviewing psychiatrist on appeal, Dr. Peter I. Brown, wrote: "Recommend psychiatric IME by US based forensic psychiatrist with experience in disability evaluation. A virtual evaluation is acceptable but should include MMPI 3 administration with appropriate protocol as per manual."

43. "The Minnesota Multiphasic Personality Inventory – Third Edition (MMPI-3) is used to screen for personality and psychosocial disorders in adults and adolescents. It also is frequently administered as part of a neuropsychological test battery to evaluate cognitive functioning. The MMPI-3 is composed of 335 true/false items. It can be administered using a printed test booklet and an answer sheet filled in by hand, or by responding to the items on a computer. When interpreting scores, please note that a T-score of 65 or above is considered to be elevated. . . . Developed with new normative data and based on the most up-to-date police candidate outcome research, this report helps psychologists identify high-risk candidates in an efficient, evidence-based, and legally defensible way." *See* 5/16/2023 IME and MMPI report. *See also* https://www.ncbi.nlm.nih.gov/books/NBK557525/.

44. Dr. Brown provided a list of information regarding the diagnosis, restrictions/limitations, and treatment plan that he wanted from the U.S.-based IME report with MMPI, as follows:

1. please provide a full DSM-5 diagnosis
2. are restrictions and limitations due to psychiatric condition present that would preclude the claimant from performing the occupational demands as per vocational analysis as of 12/09/2021 through 6/08/2022 to current?
3. if psychiatric restrictions and limitations are present, please provide [sic] a detailed treatment plan together with a reasonable time frame for implementation of appropriate care for the condition

45. On 5/3/2023, Unum gave a copy of Dr. Brown's 3/22/2023 report to Doe, together with

an opportunity to respond, as Unum was obligated under 29 C.F.R. § 2560.503-1(h)(4)(i).

46. To comply with Dr. Brown's 3/22/2023 report and provide what was missing, Doe underwent a virtual IME with MMPI with Dr. Talei on 5/16/2023.

47. Dr. Talei responded to Dr. Brown's 3/22/2023 outstanding requests for information.

48. Dr. Talei reported the MMPI results, as follows: "Doe endorsed the following as occurring on a severe basis: chronic sadness, feelings of past-failure, passive thoughts of death, loss of pleasure, irritability, loss of energy, self-criticalness, loss of interest, indecisiveness, changes in sleep pattern, agitation, and feelings of worthlessness. He also reported experiences of pessimism, self-dislike, problems with memory, and problems with concentration."

49. Dr. Talei indicated diagnoses of "296.33 major depressive disorder: severe, recurrent without psychotic feature" and "309.81 PTSD."

50. Dr. Talei assessed restrictions/limitations as follows: "The results of the IME in conjunction with observations and data collected from the clinical interview determined that Doe does experience severe affective distress. He is unable to engage in any employment in a consistent manner."

51. Dr. Talei listed behavioral observations to include: "Doe . . . spoke in full sentences though he had notable word-finding difficulties and stilted speech. His eye contact was fleeting, and he consistently squeezed his eyes shut when discussing distressing topics. Doe's affect was flat, and he sometimes sobbed uncontrollably (e.g., discussing cat's death)."

52. Dr. Talei suggested the following treatment plan: "It is recommended that he continue psychiatric treatment and resume psychotherapeutic intervention with a new provider."

53. Doe provided a copy of Dr. Talei's report with MMPI to Unum on 5/18/2023.

54. Unum received Dr. Talei's report with MMPI but never consulted with Dr. Brown or any other appropriately qualified medical professional about it.

55. Evaluating Dr. Talei's report with MMPI necessitated a medical judgment.

56. Unum issued a final adverse determination without ever consulting with Dr. Brown or any other healthcare professional about Dr. Talei's report with MMPI.

57. Unum's failure to give Dr. Talei's report to Dr. Brown or any other healthcare professional violated 29 C.F.R. § 2560.503-1(h)(3)(iii), and deprived him of a full and fair review.

Unum Violated 29 CFR § 2560.503-1(g)(1)(i)

58. 29 CFR § 2560.503-1(g)(1)(i) requires administrators to provide claimants with written or electronic notification of any adverse benefit determination. The notification shall set forth "in a manner calculated to be understood by the claimant – (i) The specific reason or reasons for the adverse determination."

59. Unum failed to strictly adhere to 29 CFR § 2560.503-1(g)(1)(i) by failing to set forth all of the reasons for denial.

60. Unum's initial denial letter on 7/19/2022 did not state that the claim was denied due to a lack of a U.S.-based IME or lack of an MMPI-3.

61. Unum's reviewer, Dr. Brown, indicated that he wanted the MMPI-3 only during the pendency of the appeal, in a report dated 3/22/2023. This addendum report was only provided to Doe on 5/09/2023.

62. Unum's failure to provide notice of the need for a U.S.-based IME and/or MMPI-3 was not *de minimis* within the meaning of 29 C.F.R. 2560.503-1(l)(2).

Unum Violated 29 CFR § 2560.503-1(j)(1)

63. 29 CFR § 2560.503-1(j)(1) obligates administrators to provide claimants with written or electronic notification of an adverse benefit determination upon review. The adverse determination on review "shall set forth, in a manner calculated to be understood by the claimant—(1) The specific reason or reasons for the adverse determination."

64. Unum failed to strictly adhere to 29 CFR § 2560.503-1(j)(1).

65. Unum failed to strictly adhere to 29 CFR § 2560.503-1(j)(1) by failing to set forth all of the reasons for denial in two (2) independent ways.

66. _First Violation of Subsection (j)(1)_: Unum's final adverse determination notice did not provide specific reasons for why Unum rejected the assessment of Doe's treating psychiatrist, Dr. Hongxia Zhang, that it was medically necessary for Doe to stop working.

67. By letter dated 2/27/2023, Dr. Zhang, Doe's treating psychiatrist, inquired why her treatment recommendations were not being taken into account. She concluded that no work is medically necessary to maximize the benefits of Doe's treatment and to prevent regression, decompensation, and self-harm.

68. By letter dated 3/18/2023, Dr. Zhang wrote, "[Doe] is at high risk of further decompensation and harm. What else do you need to approve his claim?"

69. Unum's final determination notice did not offer any rationale as to why it rejected Dr. Zhang's assessment of the medical necessity for no work.

70. Unum's silence as to Dr. Zhang's assessments does not strictly adhere to the notice requirements of 29 CFR § 2560.503-1(j)(1).

71. _Second Violation of Subsection (j)(1)_: Unum's final adverse determination notice did not provide specific reasons why Unum rejected the 4/22/2023 IME report of Dr. Peifen Yao.

72. Dr. Yao is a psychiatrist and sitting Director of the Medical Department of Shanghai Mental Health Center, BOAI Hospital.

73. Dr. Yao conducted an in-person IME of Doe in his native language, Mandarin.

74. With respect to Dr. Yao, Unum's final adverse determination only vaguely stated that this "additional information did not change [Dr. Brown's] opinion that restrictions and limitations that would limit your client from performing his occupational demands are not supported through and

beyond the elimination period" and "changes in treatment under consideration appear at best to be limited."

75. Unum's non-specific explanation with respect to Dr. Yao fails to strictly adhere to the notice requirements of 29 CFR § 2560.503-1(j)(1).

76. Dr. Yao's report contained conclusions regarding Doe's psychiatric diagnosis, restrictions/limitations, and treatment.

77. Dr. Yao diagnosed Doe with severe mixed depression and anxiety disorder, together with sleep disorder.

78. Dr. Yao assessed restrictions/limitations: "[Doe] has been unable to work normally, with the clear demonstration of significantly reduced functionality, significantly reduced social adaption, significantly reduced activity level and memory, great difficulty falling asleep and early awakening, poor sleep quality, anxiety, accompanied by the emergence of negative suicidal ideation and self-harm, and partially present self-knowledge/insight." Dr. Yao also concluded, "[Doe] has shown low self-esteem, slow reaction, and inability to make appropriate key decisions."

79. During the IME, Dr. Yao's "main clinical observations/findings" include, without limitation, that Doe "[p]resented with very depressed mood, lack of interest, and low self-esteem."

80. Dr. Yao explained that Doe suffers from "[p]ersistent depression for more than 2 years, total duration of illness more than 30 years. The patient's first episode was due to the death of a loved one and emotional problems. Afterwards, the patient had mood disturbances from time to time, but was able to continue working. . . . In the past 2 years, the patient has been experiencing strong mood swings again due to emotional problems and the death of a pet during the [COVID] lockdown, showing severe persistent depressed mood and lack of interest."

81. Dr. Yao's suggested treatment plan included: Escitalpram 15 mg/day; Quetiapine

fumarate 200 mg/day; Clonazepam 1 mg/day; and "Continue to rest without work until further notice."

82. After examining Doe and reviewing information medical information dating back to August 2021, Dr. Yao specifically concluded: "Based on my review of the file and my examination, it is reasonable that my assessment is consistent with Doe's functioning dating back to 12/8/2021."

83. Unum's final adverse determination did not explain why Dr. Yao's findings were not disabling.

Unum Violated 29 CFR § 2560.503-1(b)(5):

84. 29 CFR § 2560.503-1(b)(5) obligates administrators to establish and maintain reasonable claims procedures, as follows:

> (b) Obligation to establish and maintain reasonable claims procedures. Every employee benefit plan shall establish and maintain reasonable procedures governing the filing of benefit claims, notification of benefit determinations, and appeal of adverse benefit determinations (hereinafter collectively referred to as claims procedures). The claims procedures for a plan will be deemed to be reasonable only if
> […]
> (5) The claims procedures contain administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants.

85. Unum failed to strictly adhere to the mandatory requirements of § 2560.503-1(b)(5) in two (2) independent ways.

86. *First Violation of Subsection (b)(5)*:  Unum failed to strictly adhere to § 2560.503-1(b)(5) by failing to establish or maintain a reasonable claims procedure to ensure that claimants residing outside of the United States, including Doe, are afforded the same opportunity to undergo an independent medical examination as similarly situated claimants residing within the United States.

87. "Unum is the leading provider of group and individual disability benefits in the U.S." *See* https://www.unum.com/brokers/solutions/benefits-portfolio.

88. Unum does not only provide disability benefits to residents in the United States.

89. Unum knowingly provides group long term disability coverage to insureds residing outside the United States.

90. Unum collects premiums paid by group long term disability insureds residing outside of the United States.

91. Unum, in its regular course of business, conducts psychiatric/psychological examinations and neuropsychological testing to evaluate how claimants' mental health is impacting their ability to perform their occupational duties. Unum refers to these as "Independent Medical Examinations."

92. Unum maintains procedures for conducting its medical examinations of claimants, including for the purpose of evaluating the potential impact of mental illness on disability.

93. Upon information and belief, Unum does not maintain procedures for conducting medical examinations outside of the United States and the United Kingdom.

94. Doe, a beneficiary with depression and anxiety who resides in Shanghai, requested that Unum perform an examination of him.

95. Doe's treating psychiatrist in Shanghai, Dr. Zhang, wrote to Unum, "Schedule your own examination of my patient and you will see why this patient cannot return to his work."

96. Unum did not afford Doe the opportunity of an in-person examination in a clinical setting.

97. Unum only scheduled a "virtual" Zoom session, rather than an in-person examination performed in a clinical setting, and offered to provide a virtual translator for Doe.

98. Doe requested that the virtual session be rescheduled to be in-person, in a regular clinical setting in Shanghai, but Unum refused – insisting that a virtual session would suffice.

99. By letter 3/30/2023, Dr. Zhang explained to Unum why an in-person IME with a native Mandarin speaker was necessary to properly evaluate Doe's psychiatric condition.

100. When Unum refused to schedule an in-person psychiatric examination of Doe, he

requested the cancelation of the virtual examination, and Doe scheduled his own in-person examination with Dr. Yao, the independent doctor he located in Shanghai.

101.    For similarly situated claimants residing within the United States, Unum, in its regular course of business, often conducts *in-person* examinations and neuropsychological testing to evaluate how a claimant's mental health is impacting their ability to work.

102.    Conducting an examination by Zoom, or any other virtual session, for foreign-residing claimants, like Doe, affords them a lesser opportunity to have their claim fairly evaluated than similarly situated claimants residing in the United States.

103.    Clinical observations would suffer on Zoom or any other virtual setting.

104.    An examiner using Zoom, or any other virtual setting, would be at a disadvantage in observing eye contact, psychomotor movements (including subtle movements or those off-frame), the grooming and hygiene of the examinee, and other relevant clinical observations relevant to evaluating a psychiatric disability.

105.    Conducting an examination by Zoom, or any other virtual setting, also has the potential to stifle communications – equally critical to a psychiatric evaluation – particularly when translation issues are added into the mix.

106.    Dr. Zhang explained why performing an examination in a clinical setting was reasonably necessary to evaluate Doe's psychiatric condition.

107.    In a letter dated 2/27/2023, Dr. Zhang explained:

> To appropriately evaluate a psychiatric condition, a psychiatrist must observe the patient in a clinical setting. Observation is critical to accurately and reliably evaluating a patient who suffers from a psychiatric condition, like Doe.

> Observation is a basic standard in psychiatry across the globe. There is a reason for it. A patient with a spinal condition could be evaluated by reviewing an MRI on paper. The image and the results on paper are clear. However, no such clear image exits [sic] for a patient suffering from a psychiatric condition.

> In a clinical setting, I have personally observed and listened to Doe exhibit severe psychiatric symptoms consistent with an inability to work, as previously described. Based on my clinical observations and experience with Doe, I can assure you that he is disabled. There is no doubt. This is my professional opinion, based on my observations and experience with Doe.

108.    In a letter dated 3/18/2023, Dr. Zhang expressed frustration with Unum's non-examining review process and explained why it was necessary to have clinical observations:

> [Unum's non-examining doctors'] refusal to accept my well supported assessment, in spite of my detailed explanations and in-person observations, is absolutely unreasonable. . . . I have explained this in extensive detail and will not reiterate my observations and findings yet again here because I am convinced you simply do not care or wish to listen. . . . The [non-examining] reviewers essentially did not respond to any concerns raised in my last letter. What is the purpose of this exchange between physicians if they do not respond to me?
> […]
> My patient is very obviously incapable of performing many normal activities of daily living, let alone work, due to a severe psychiatric condition. He is at high risk of further decompensation and harm.

109.    In a letter dated 2/27/2023, Dr. Zhang wrote: "As the leading psychiatrist at our clinic, one of the best in Shanghai, I'm very professional and confident in my long-term ongoing observations and professional judgment. I am tired of providing such details, only to have my assessment totally ignored and dismissed."

110.    _Second Violation of Subsection (b)(5)_:  Unum also violated § 2560.503-1(b)(5) by failing to establish or maintain a reasonable claims procedure to ensure that claimants residing outside of the United States, including Doe, are afforded the same opportunity to have the standards of care in their country of residence considered as similarly situated claimants residing in the United States.

111.    While considering Doe's claim, Unum never consulted with a medical professional that was familiar with standards of care and treatment in Doe's country of residence, Shanghai, China.

112.    Unum affords claimants residing in the United States the opportunity to be examined by doctors who are familiar with standards of care in the United States.

113.    Dr. Zhang wrote, "I asked for information about [Unum's] reviewing doctors' familiarity with psychiatric care here [in Shanghai]. There was no response."

114.    By letter dated 2/27/2023, Dr. Zhang explained why it was important for Unum to consider the differences in the standard of care between the United States and Shanghai:

> There is a cultural and standard of care barrier. Our standards of treatment and approach to evaluating patients in Shanghai varies from your approach in the United States. Our examinations may differ. Our recommendations may differ. The observations that I find important likely differ too. How is this being taken into account? I am not confident that [Unum's doctors] are trained and qualified in the psychiatric standards of care and evaluation that we apply here in Shanghai.

115.    In letter dated 3/18/2023, Dr. Zhang detailed differences in the standards of care in the United States versus Shanghai, including the medication regime she prescribed, which Unum's doctors criticized. For example, Unum's final adverse determination notice stated, "If severe and ongoing impairment were present, one would reasonably expect further adjustments in medication."

116.    In relevant part, Dr. Zhang had explained in her letter dated 03/18/2023:

> [C]ommonly used doses of psychotropic medication vary between different ethnic populations. In China, the doses of antidepressants and antipsychotics tend to be lower than those commonly used in American society, both in terms of guideline recommendations and clinical experience. At higher doses Han Chinese patients are prone to adverse reactions. Therefore, it is also clearly biased to judge the adequacy of treatment for Han Chinese patients based only on the US experience of medical practice.

117.    Dr. Zhang also explained: "Various medications (including but not limited to, Duloxetine, Quetiapine, Clonazepam) have been tried but none have abated Doe's symptoms."

118.    Dr. Zhang confirmed, as of 1/20/2023:

> Doe is currently taking Clonazepam, Seroquel, and Lexapro, which has been used to replace [D]uxoetine since the end of November 2022. From these medications Doe is experiencing significant known side effects, including drowsiness/fatigue; dizziness/unsteadiness; difficulty thinking or remembering; muscle/joint pain; and headache. Due to the side-effects of Doe's previous medications, he was

switched to lower ones at different dosages to minimize the effects. These medications are now being increased to help his symptoms but the side effects are still present.

Unum Violated 29 CFR § 2560.503-1(g)(vii)(D) and (m)(8)(iii):

119.    29 CFR § 2560.503-1(g)(vii)(D) requires that the administrators' written benefit determination include "A statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits.  Whether a document, record, or other information is relevant to a claim for benefits shall be determined by reference to paragraph (m)(8) of this section."

120.    29 CFR § 2560.503-1(m)(8)(iii) states that "[a] document, record, or other information shall be considered 'relevant' to a claimant's claim if such document, record, or other information . . .Demonstrates compliance with the administrative processes and safeguards required pursuant to paragraph (b)(5) of this section in making the benefit determination."

121.    Unum failed to strictly adhere to the requirements of (g)(vii)(D) and (m)(8)(iii) by failing to provide Doe relevant claims handling procedures designed to ensure that claimants residing outside of the United States are afforded the same claim consideration opportunities as similarly situated claimants residing within the United States.

122.    In a letter dated 9/15/2022, Doe through his counsel requested that Unum produce all documents to which he is entitled under (b)(5), (g)(vii)(D), and (m)(8)(iii).

123.    Unum did not produce any documents in response to Doe's 09/15/2022 request for documents under (b)(5), (g)(vii)(D), and (m)(8)(iii).

124.    In a letter to Unum dated 03/31/2023, Doe through his counsel specifically requested "a copy of Unum's relevant claims handling procedures for conducting medical examinations of beneficiaries who reside abroad."  Doe through his counsel also wrote:

Unum sells group disability insurance products to employers that Unum knows ha[ve] employees abroad.  Thus, we assume that Unum

> has a procedure for conducting physical and/or psychiatric examinations in those countries, in a manner that is as fair as possible for those beneficiaries. Otherwise, beneficiaries would be treated differently than those found withing the United States, under the same plan terms. We are entitled to a copy of any such relevant procedure and request a copy, accordingly.

125.    Unum did not produce any relevant documents in response to Doe's March 31, 2023 request for documents under (b)(5), (g)(vii)(D), and (m)(8)(iii).

<u>No Exceptions Apply to Justify Unum's Procedural Violations</u>

126.    Where a plan grants the administrator discretion, a plan administrator's determination is deemed to be made <u>without</u> the exercise of discretion if the administrator fails to strictly adhere to all the requirements of the Claims Regulations, subjecting that determination to the Court's *de novo* review. 29 C.F.R. § 2560.503-1(l)(2)(i).

127.    The exception to the rule stated at 29 C.F.R. § 2560.503-1(l)(2)(i) is very limited, and the administrator has the burden of proving all the following:

- that the violation was *de minimis*;
- that the violation did not cause, and is not likely to cause, prejudice or harm to the claimant;
- that the violation was for good cause or due to matters beyond the control of the plan; and
- that the violation occurred in the context of an ongoing, good faith exchange of information between the plan and claimant.

128.    The exception, furthermore, will not apply if the violation is part of a pattern or practice of violations by the plan. See 29 C.F.R. § 2560.503-1(l)(2)(ii).

129.    Here, the *de novo* standard applies because Unum violated the regulations, as detailed above in paragraphs 38 through 125, and Unum cannot satisfy its burden of establishing the exception to the Regulation. See 29 C.F.R. § 2560.503-1(l)(2).

### <u>UNUM FAILED TO PROVIDE A VALID REASON FOR REFUSING TO CONSIDER EVIDENCE</u>

130.    ERISA's claims regulations at 29 C.F.R. §2560.503-1 set forth minimum procedural

requirements for plan administrators, like Unum.

131.    Unum's final adverse determination notice did not provide specific reasons for why Unum rejected the 5/16/2023 IME report of Dr. Talei, directly violating 29 C.F.R. §2560.503-1(j)(1).

132.    With respect to Dr. Talei's report and MMPI, Unum's final determination notice only vaguely states, "This examination report [by Dr. Talei] does not contain any new time relevant clinical data related to your client's elimination period."

133.    Unum's final determination notice does not explain how Dr. Talei's evaluation with MMPI, which Unum's own doctor made clear that he wanted as detailed above in paragraphs 40 through 57, would not be "time relevant."

134.    Multiple Courts concluded that "time relevance" is not a valid reason for refusing to consider evidence.  *See*, *e.g.*, *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 776 (7th Cir. 2010); *Barbu v. Life Ins. Co. of N. Am.*, 35 F. Supp. 3d 274 (E.D.N.Y. 2014); *Yasinoski v. Conn. Gen. Life Ins. Co.*, 2011 WL 890752 (E.D.N.Y. Feb. 22, 2011); and *Slupinski v. First Unum Life Ins. Co.*, 2005 WL 2385852 (S.D.N.Y. Sept. 27, 2005), *remanded on other grounds*, 554 F.3d 38 (2d Cir. 2009).  This is true where, as here, the conditions remain the same during the appeal process. *See Kaviani v. Reliance Std. Life Ins. Co.*, 373 F. Supp. 3d 1337, 1345 (M.D. Fla. 2019), *aff'd*, 799 F. App'x 753 (11th Cir. 2020).

135.    Courts have admonished Unum for its "time relevant" rationale before, as recently as 2022 in the Southern District of New York.  *See*, *e.g.*, *Chico v. First Unum Life Ins. Co.*, 2022 WL 621985, at *4 (S.D.N.Y. Mar. 3, 2022), *on reconsideration*, (S.D.N.Y. Mar. 30, 2022); *see also Luu v. First Unum Life Ins. Co. of Am.*, 2019 WL 6622848 (C.D. Cal. Nov. 14, 2019); *see also Slupinski*, 2005 WL 2385852.

136.    Unum's denial of Doe's long term disability benefits was wrongful and without basis in law or fact.  The determination to deny benefits was against the substantial weight of the evidence and was arbitrary and capricious.  Despite evidence from Doe's treatment providers that explains

Doe's psychiatric impairments and how they preclude him from being employed in his own occupation, Unum has refused to acknowledge that Doe is disabled under the terms of the LTD Plan.

## THE MEDICAL EVIDENCE DEMONSTRATES DOE CANNOT MEET THE DEMANDS OF HIS OCCUPATION

137.    The weight of the evidence demonstrates that Doe cannot meet the demands of his occupation.

138.    All medical professionals who examined Doe have unanimously concluded that he is disabled from his psychiatric conditions.

139.    Doe was examined by two psychiatrists, a neuropsychologist, and a psychologist, in-person and virtually – all of whom concluded that Doe cannot work.

140.    The examining medical professionals who unanimously concluded Doe cannot work include: psychiatrist Hongxia Zhang, MD; neuropsychologist Wilfred van Gorp, Ph.D., ABPP; psychiatrist Peifen Yao, MD; and psychologist Bahareh Talei, Psy.D.

Doe's Treating Psychiatrist, Dr. Zhang

141.    Dr. Zhang has been Doe's treating psychiatrist in Shanghai since August 2021.

142.    Dr. Zhang diagnosed Doe with mixed depressive and anxiety disorder.

143.    Dr. Zhang's treatment notes are documented in Mandarin.

144.    The communications and treatment notes from Dr. Zhang in the file have been translated from Mandarin to English.

145.    In her 5/02/2023 response, Dr. Zhang expressed concern that a return to work would interfere with Doe's treatment and pose an unreasonable risk of harm.

146.    Dr. Zhang's Mental Examinations from 12/09/2021 through 5/02/2023 are consistent with a disabling psychiatric impairment and revealed symptoms:

    a.    Depressed mood;
    b.    Anxiety;
    c.    Negative thinking;

    d.  Worry about pandemic;
    e.  Lack of interest;
    f.  Lack of motivation;
    g.  Difficulty in concentration;
    h.  Difficulty in making decisions;
    i.  Attention affected;
    j.  Sadness;
    k.  Self-blame;
    l.  Fatigue;
    m.  Decreased energy;
    n.  Head pain;
    o.  Dizziness;
    p.  Poor appetite;
    q.  Physical discomfort; and
    r.  Light, short, slow, shallow sleep.

147.    Dr. Zhang's treatment plan for Doe from 12/09/2021 through 5/02/2023 included: various medications and adjustments to those medications; listening and encouraging; psychotherapy; sick leave; deep breathing and relaxation exercises; cognitive adjustment; and recommendations to socialize, participate in volunteer work, and increase activities under personal protection.

148.    On 12/29/2022, Dr. Zhang reported that "various medications (including but not limited to, Duloxetine, Quetiapine, Clonazepam) have been tried but none have abated Doe's symptoms."

149.    Dr. Zhang reported in her 1/30/2023 letter that Doe is experiencing significant known side effects from his medications, including: drowsiness; fatigue; dizziness; unsteadiness; difficulty thinking or remembering; muscle pain; joint pain; and headache.

150.    Due to side effects and the ineffectiveness of Doe's medications, Dr. Zhang has made multiple adjustments to his medications.

151.    For treatment, Dr. Zhang recommended that Doe engage in socializing by volunteering to deliver groceries. Dr. Zhang concluded in her 1/30/2023 letter that this was a failed attempt as "due to his condition, [Doe] made mistakes [during his volunteer attempt] and it caused him to feel more depressed because he used to pride himself on being detail oriented."

152.    Dr. Zhang also tried adding psychotherapy to the treatment regime, but it only resulted in temporary improvement with ongoing symptoms.  In treatment notes dated 1/30/2023, Dr. Zhang documented:

> Since psychotherapy, [Doe's] mood has temporarily improved. He can visited his grandmother during the Spring Festival. But the mood is still easy to fluctuate, with unconsciously revealing negative thoughts and short crying. Avoiding social interaction. He returned to Shanghai earlier than planned. Most of the time lack of motivation, less activity, long time in bed. Want to increase the number of times to walk the dog, but still do it only once a day.

153.    Dr. Zhang assessed the following in a letter dated 02/27/2023:

a.  "[Doe] cannot interact appropriately with coworkers and other people in a normal work setting";
b.  "His emotional regulation is poor";
c.  "He is avoidant and isolated";
d.  "He spirals, ruminates and decompensates when faced with conflict or stress";
e.  "He is quick to anger and prone to outbursts";
f.  He lacks motivation to perform daily tasks";
g.  "His self-confidence is very low"; and
h.  "He has difficulty expressing his emotions."

154.    Dr. Zhang reported in her 1/30/2023 letter that:

> As a result of his symptoms from his disability[,] Doe isolates himself. He will avoid friends, colleagues, and any social situations. Doe experiences poor motivation; difficulties with maintaining hygiene; emotional instability; anxiety; quick to anger; lack of interest; increased nervousness/easily startled; poor appetite; difficulty with attention and concentration; feelings of hopelessness and helplessness; and negative thinking with self-blame.

155.    In Dr. Zhang's 1/30/2023 and 3/18/2023 letters, she concluded Doe is totally disabled because: (1) he cannot meet the high-level cognitive demands of his work as a consultant; (2) has difficulty maintaining attention and concentration to produce the high quality work that his occupation requires; (3) he cannot handle stress or changes in routine; (4) he cannot tolerate prolonged social interaction; and (5) would not be able to complete a normal workday/workweek.

Neuropsychological Evaluation by Dr. Wilfred van Gorp

156.    Doe underwent a Neuropsychological Evaluation with Dr. van Gorp on 10/20/2022, 10/21/2022, and 12/05/2022.

157.    Dr. van Gorp diagnosed Doe with Major Depressive Disorder, Recurrent, Severe (296.33) and Generalized Anxiety Disorder (300.02).

158.    Doe was tested on three occasions (10/20/2022, 10/21/2022, and 12/05/2022), but only the data from the last testing session (12/05/2022) was used for valid clinical interpretation.

159.    During the 10/20/2022 and 10/21/2022 Neuropsychological Evaluation with Dr. van Gorp, due to the severity of Doe's depression and his suicidality, he was unable to put forth appropriate effort, and Dr. van Gorp ceased testing.

160.    Upon further questioning by Dr. van Gorp, Doe indicated that he did not intend to take imminent action, and his suicidal ideation is being monitored by his psychiatrist, Dr. Zhang.

161.    Dr. van Gorp was sufficiently concerned with Doe's suicidal ideation and depression that he met with Doe via Zoom two times after the October 2022 neuropsychological evaluation sessions to assess his mental health, discuss treatment options, and a third testing session.

162.    Following Doe's first two-day assessment for the Neuropsychological Evaluation in October 2022, he resumed testing and his scores on all three effort measures indicated a valid performance in December 2022.  Specifically, these validity measures included:

    a.  Score of 7 on the Reliable Digit Span indicated valid performance;
    b.  Valid performance on the nonverbal portion of the VIP (the verbal portion was not administered because Doe is a nonnative English speaker); and
    c.  Doe demonstrated good effort on the TOMM (Trial 2 = 47).

163.    Results from Doe's Neuropsychological Evaluation on the test of Personality Assessment Inventory (PAI) revealed:

> Doe's clinical profile is marked by significant elevations across several scales, indicating the severity of his psychiatric distress. His configuration of clinical scales suggests a man with significant

unhappiness, moodiness, and tension. His self-esteem is quite low and he views himself as ineffectual and powerless to change the direction of his life. He reports difficulties concentrating and making decisions, and the combination of hopelessness, agitation, confusion, and stress apparent in these scores places him at increased risk for self-harm.

164.    In Dr. van Gorp's letters dated 2/26/2023 and 3/18/2023, he again confirmed that Doe passed validity measures.

165.    Dr. van Gorp concluded, "based on [Doe's] level of educational and occupational achievement, Doe's premorbid-intelligence abilities would be expected to be in the High Average range, if not higher."

166.    Dr. van Gorp concluded that "in spite of having tried many psychotropic medications, test results indicate that Doe is experiencing impairment across multiple cognitive domains associated with his severe depressive disorder."

167.    Dr. van Gorp assessed that "Doe's severe depression results in decreased energy, motivation, sleep, concentration, appetite, as well as emotional instability."

168.    The results of Doe's December 2022 Neuropsychological Evaluation revealed deficiencies in:

    a.  Intellectual functioning tasks of processing speed - Borderline range, 8th percentile (PSI = 79);

    b.  Attention and concentration test of visual scanning and psychomotor speed - Extremely Low range;

    c.  Attention and concentration tasks of auditory attention and working memory span (WAIS-IV: Digit Span) - Low Average range, 9th percentile;

    d.  Concentration and mental control (WAIS-IV: Letter-Number Sequencing) – Low average range;

    e.  Auditory attention and vigilance (PASA 1) - 8th percentile

    f.  Rapidly produce words from specific semantic categories during 60-second intervals (DKEFS Verbal Fluency Alternate, Category Fluency) – Extremely low;

    g.  Switching between generating words from two different categories, the total number of correct words - 5th percentile;

    h.  Ability to immediately recall the details of two orally presented short stories (WRAML-3 Story Memory) – Low Average range (16th percentile);

    i.  After a 20-minute delay (WRAML-3 Story Memory, Story Recall Delayed) – Borderline range;

j.  Memory for a complex figure over four learning trials immediate recall (WRAML-3 Design Memory) – Extremely Low range, 2nd percentile

k.  Memory for a complex figure over four learning trials delay upon (WRAML-3 Design Memory Delayed) – Borderline range; and

l.  Psychomotor speed and cognitive flexibility (Trail Making Test, Part B) - Extremely Low range 2nd percentile.

169.    Doe scored 4.5 standard deviations above the mean on the PAI, indicating the severity of his depressed mood.

170.    Dr. van Gorp concluded from the Neuropsychological Evaluation that "Doe's level of depression is quite severe, to the point that he actively considers plans for how to commit suicide."

171.    On the Neuropsychological Evaluation Doe's clinical profile is marked by significant elevations across several scales, indicating the severity of his psychiatric distress, including:

a.  BDI-2 raw score 50; interpretation – severe depressed mood; and

b.  BAI raw score 35; interpretation – severe anxiety

172.    Dr. van Gorp concluded Doe is likely to be a socially isolated individual who has few interpersonal relationships that could be described as close and warm.

173.    Dr. van Gorp indicated Doe's thought processes are likely to be marked by confusion, distractibility, and difficulty concentrating, and he may experience his thoughts as being somehow blocked or disrupted.

174.    Dr. van Gorp concurred with the assessment of Doe's treating psychiatrist, Dr. Zhang, that due to Doe's significant depression and cognitive impairment involving psychomotor speed, attention, memory, and verbal fluency, he is unable to work in his own occupation or any other occupation.

<u>In-Person Independent Medical Examination by Dr. Yao</u>

175.    Dr. Yao performed an in-person IME of Doe on 4/21/2023.

176.    Dr. Yao reviewed Dr. Zhang's records from August 2021 through March 2023 and the Neuropsychological Evaluation from Dr. van Gorp.

177.    Dr. Yao clinically observed that Doe presented with a very depressed mood, lack of interest, and low self-esteem.

178.    Dr. Yao concluded that Doe cannot work normally, with the clear demonstration of significantly reduced activity level and memory; great difficulty falling asleep and early awakening; poor sleep quality; anxiety accompanied by the emergence of negative suicidal ideation and self-harm; and partially present self-knowledge/insight.

179.    Dr. Yao concluded that her assessment is consistent with Doe's functioning dating back to 12/08/2021.

180.    Dr. Yao diagnosed Doe with severe mixed depressive and anxiety disorder and sleep disorder.

181.    Dr. Yao suggested prescriptions of escitalopram 15mg, quetiapine fumarate 200 mg, and clonazepam 1 mg per day.

182.    Dr. Yao recommended that Doe continue to rest without work till further notice.

<u>Virtual Independent Medical Examination with MMPI-3 by Dr. Talei</u>

183.    Doe participated in an IME with MMPI-3 on 5/16/2023 with Dr. Talei.

184.    The MMPI-3 was administered to Doe virtually by the recommendation of Unum's Peer Reviewer Dr. Brown on 3/22/2023.

185.    Dr. Talei listed her behavioral observations to include:

   a.  Notable word finding difficulties and stilted speech;
   b.  Eye contact was fleeting;
   c.  Consistently squeezed eyes shut when discussing distressing topics;
   d.  Affect was flat; and
   e.  Sobbed uncontrollably.

186.    Dr. Talei completed a safety assessment because Doe reported suicidal ideation.

187.    Doe's MMPI-3 testing results revealed he reported cognitive dysfunction in memory, attention and concentration, and confusion.

188.    Doe's MMPI-3 testing results revealed emotional dysfunction including:

    a.  Risk of self-harm, preoccupation with suicide and death, and at risk for current suicidal ideation and attempt, exacerbated by poor impulse control;

    b.  Considerable and pervasive emotional distress;

    c.  Presents with anhedonia, lack of energy, and displays vegetative symptoms of depression; and

    d.  Reports of compulsive behavior, worrying excessively, ruminates anxiety/panic, self-doubt, lack of motivation, indecisive/inefficacious, incompetence, significant demoralization, feeling overwhelmed, helpless/hopeless, and being extremely unhappy, sad, and dissatisfied with his life.

189.    Doe's MMPI-3 testing results revealed behavioral dysfunction including:

    a.  Family conflicts, poor family functioning, negative feelings about family members

    b.  Poor impulse control with history of hyperactive behavior;

    c.  Passive/submissive in interpersonal relationships; and

    d.  Avoiding social situations, including parties/other events with crowds.

190.    Based on the MMPI-3 results, Dr. Talei diagnosed Doe with 296.33 Major Depressive Disorder: Severe, recurrent without psychotic features and 309.81 PTSD.

191.    Dr. Talei concluded that Doe experiences severe affective distress from the IME results, her own observations, and data collected from the clinical interview.

192.    Dr. Talei concluded Doe is unable to engage in any employment in a consistent manner.

193.    Dr. Talei recommended that Doe continue psychiatric treatment and resume psychotherapeutic intervention with a new provider.

<u>Dr. Zhang and Dr. van Gorp Concluded a Return to Work Would Put Doe at Risk of Self-Harm</u>

194.    Dr. Zhang concluded on 02/27/2023: "Within a reasonable degree of medical certainty, a return to work at any point since the beginning of Doe's disability would have devastating consequences, including a high risk of suicide and self-harm.  It is not recommended."

195.    Dr. Zhang concluded on 03/18/2023: "[Doe] is at a high risk of further decomposition and harm."

196.    Again, Dr. Zhang concluded on 5/02/2023 that, "I am concerned about how a return

to work would interfere with treatment and would pose an unreasonable risk of harm to Doe as he

continues psychiatric care."

197.    In his Neuropsychological Evaluation report, Dr. van Gorp concluded that "[Doe]

reports difficulties concentrating and making decisions, and the combination of hopelessness,

agitation, confusion, and stress apparent in these scores places him at increased risk for self-harm."

198.    Dr. van Gorp concluded in his 2/26/2023 letter that "[a] return to work is

unreasonable, and in my opinion, unthinkable at this time and would put Doe at an unreasonable and

profound/heightened risk of self-harm."

## UNUM'S CONFLICT OF INTEREST

199.    Unum has been operating under an inherent and structural conflict of interest because

Unum is liable for benefit payments due, and each payment issued depletes Unum's assets.

200.    Unum's determination was influenced by its conflict of interest which extended to and

infected its non-examining reviewers.

201.    Unum's conflict of interest is best exemplified in this case by:

    a.    Unum's failure to disclose Dr. Brown's 3/22/2023 report containing his
          recommendation for a virtual, U.S.-based IME with MMPI until 5/9/2023, then
          refusing to give Doe a reasonable amount of time to respond, which caused Doe
          to rush to meet Unum's demands by getting the report with MMPI by Dr. Talei;
          and
    b.    Unum's subsequent failure to provide a copy of Dr. Talei's report with MMPI to
          Dr. Brown or any other medical professional before issuing the Final
          Determination.

## COUNT I (The LTD Plan)

202.    Doe repeats and re-alleges the allegations set forth in paragraphs 1 through 201 above.

203.    Unum had no legal basis to deny Doe's benefits under the LTD Plan.

204.    Under the terms of the LTD Plan, Unum agreed to provide Doe with certain benefits

under such plan, in accordance with the terms and conditions set forth therein.

205.    To date, Unum has failed and refused to provide Doe the benefits under the LTD

Plan to which he is rightfully entitled, from 6/08/2022 and through the present date.

206.    Doe has satisfied all conditions precedent under the LTD Plan and is thus eligible to receive benefits beyond 6/08/2022.

207.    Unum's determination that Doe is not Disabled within the meaning of the LTD Plan is contrary to the terms of the LTD Plan, ERISA and the DOL Regulations issued thereunder, contrary to the evidence, unreasonable, and arbitrary and capricious.

208.    The unlawful behavior of Unum is evidenced by the following:

a.    Denying benefit payments to Doe when Unum knew that he was entitled to said benefits, in bad faith and contrary to the Plan;

b.    Unreasonably denying and withholding payments from Doe knowing his claim for benefits was valid;

c.    Unreasonably failing to pay benefits without having any evidence, substantial or otherwise, supporting its decision to deny benefits;

d.    Ignoring Doe's treating providers' assessments of his medical conditions and how they restrict and limit him from performing his Occupation, without any basis for doing so in violation of 29 C.F.R. § 2560.503-1(h)(2)(iv);

e.    Failing to explain the basis for disagreeing with the healthcare professionals treating Doe, in violation of 29 C.F.R. § 2560.503-1(g)(1)(a);

f.    Failing to take into account all comments and documents submitted, in violation of 29 C.F.R. § 2560.503-1(h)(2)(iv);

g.    Failing to consult with a qualified healthcare professional in violation of 29 C.F.R. § 2560.503-1(h)(3)(iii);

h.    Relying on non-examining medical consultants to deny a claim supported by the treating providers and independent medical examiners;

i.    Failing to provide Doe with the new rationales for the Final Determination in advance of the Final Determination regarding Dr. Talei's independent medical examination with MMPI, denying Doe a reasonable opportunity to respond, in violation of 29 C.F.R. § 2560.503-1(h)(4)(ii);

j.    Refusing to give appropriate consideration to Dr. Talei's independent medical examination;

k.  "Cherry-picking" and selectively highlighting certain factors in medical or reviewing reports to cast a favorable light on its position, while ignoring the conclusions of Doe's treating providers regarding the conditions for which they render treatment;

l.  Completely disregarding Doe's subjective complaints, his own assessment of his medical conditions, and how they restrict and limit him from performing the Occupation, in violation of 29 C.F.R. §2560.503-1(h)(2)(iv);

m.  Engaging in a pattern of procedural irregularities to advance its own corporate interests in terminating benefits, to the detriment of the Plans' participants;

n.  Failing to provide a "full and fair review" as Unum was obligated to do pursuant to 29 C.F.R. §2560.503-1(h)(4);

o.  Failing to provide Doe with an adequate description of any additional material or information necessary to perfect his claim in violation of 29 C.F.R. §2560.503-1(g)(1)(iii);

p.  Failing to maintain and utilize "reasonable claims procedures" as it was obligated to do pursuant to 29 CFR § 2560.503-1(b), in violation of ERISA;

q.  Failing to follow its own internal claims administration policies and procedures;

r.  Consistently acting in its own corporate interests instead of those of the Plans and their participants; and

s.  Unum's unlawful behavior and violations of ERISA's procedural regulations were purposeful and harmful to Doe.

209.    Doe has been forced to bring the instant action as a direct result of Unum's unlawful benefit denial and violations of the Plans and ERISA.

210.    Under Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), Doe is entitled to recover disability benefits under the Plans that have not been paid to date, with interest, and those that will become due in the future.

## COUNT II (Attorney Fees and Costs)

211.    Doe repeats and re-alleges the allegations set forth in paragraphs 1 through 210 above.

212.    By reason of Unum's failure to pay Doe long term disability benefits due under the terms of the Plan, Doe has been forced to retain attorneys to recover such benefits, for which he has and will continue to incur attorney's fees.

213.    Doe is entitled to recover reasonable attorneys' fees and the costs of this action, pursuant to Section 502(g)(1) of ERISA, 29 U.S.C. § 1132(g)(1).

**WHEREFORE**, Doe demands judgement against Unum:

A.  For the amount of all long term disability benefits due under the terms of the LTD Plan that have not been paid, together with interest thereon;

B.  Clarifying and declaring that the LTD Plan is obligated to pay Doe long term disability benefits in the future as required by the LTD Plan;

C.  For the costs of this action and Doe's attorney's fees, pursuant to Section 502(g) of ERISA, 29 U.S.C. § 1132(g)(1); and

D.  For such other and further relief as may be deemed just and proper by the Court.

Dated: New York, New York
       July 31, 2023

By:    /s/ Jennifer Hess _____
       Jennifer Hess (JS 3684)
       RIEMER HESS LLC
       Attorneys for Plaintiff
       275 Madison Avenue, 26th Floor
       New York, New York 10016
       (212) 297-0700
       jhess@riemerhess.com