UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
                                       :
GUANGYU LI,                            :
                                       :
                    Plaintiff,         :        23cv6985 (DLC)
                                       :
        -v-                            :
                                       :        OPINION AND ORDER
FIRST UNUM LIFE INSURANCE COMPANY,     :
                                       :
                    Defendant.         :
                                       :
---------------------------------------X

APPEARANCES:

For plaintiff:
Jennifer Lynn Hess
Ryan James McIntyre
Samantha Wladich
Scott Madison Riemer
Riemer Hess LLC
275 Madison Avenue, 26th Floor
New York, NY 10016

For defendant:
Patrick Walter Begos
Raymond J Carta
Robinson & Cole LLP
1055 Washington Blvd
Stamford, CT 06901

DENISE COTE, District Judge:

        Plaintiff Guangyu Li, a former employee of McKinsey & Co.

("McKinsey"), has sued First Unum Life Insurance Company ("First

Unum") under the Employee Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. § 1001 et seq.  Li alleges that First Unum

improperly denied his application for long term disability

benefits.  This Opinion presents the Court's findings of fact

and conclusions of law following a bench trial.  For the reasons
stated below, judgment is granted to First Unum.

## Background

The following contains many of the Court's findings of
fact.  Some are contained in the Discussion, which follows.

A.   Li's Application for Benefits

Guangyu Li resides in Shanghai, China.  He is 55 years old.
In 1999, he began working for McKinsey as a consultant.  As of
2021, Li was a Senior Partner at McKinsey, where he worked with
clients across China.  He earned an annual salary of
$1,572,900.00.

Li submitted a claim for long term disability benefits
pursuant to McKinsey's Group Long Term Disability Insurance
Policy (the "Policy") on April 6, 2022.  For those who qualify
for coverage, the Policy provides for two-thirds of basic
monthly earnings, with a maximum monthly benefit of $35,000.
The Policy also provides that a claimant under the age of 60 is
eligible to receive benefits up until the age of 65.  Li was 53
years old when he submitted his application.

To qualify for long term disability benefits under the
Policy, Li is required to show that he was disabled and that he
required the regular attendance of a physician.  The Policy
defines "disability" and "disabled," in relevant part, as

2

meaning that "because of injury or sickness . . . you cannot perform each of the material duties of your regular occupation[.]"

The Policy further explains that once First Unum receives proof that an insured is disabled, First Unum will pay the insured a monthly disability benefit "after the end of the elimination period."  The Policy provides for an elimination period of 180 days, which is a "period of consecutive days of disability for which no benefit is payable," and which begins on the first day of alleged disability.  Days that the insured is not disabled do "not count toward the elimination period."  The Policy thus required that Li prove that he remained disabled through his elimination period.  Li's elimination period runs from December 9, 2021, the day after he last worked for McKinsey, to June 8, 2022.

In his application, Li stated that he first noticed symptoms of "anxiety and depression" in "[e]arly July of 2021," that he was first treated by a physician on August 5, 2021, and that his last day of work was December 8, 2021.  Li reported that he had not been treated for this condition in the past and that his condition was "partially related" to his occupation, due to a "[m]ajor shift in working scope and boundries [sic]." He explained that he was unable to perform the "major decision

making" duties of his occupation and was currently taking three medications prescribed by Dr. Hongxia Zhang, M.D.  He also noted that he was currently receiving short term disability benefits, which covered the period December 9, 2021 to June 8, 2022.

Along with his application, Li attached an "Attending Physician Statement" from Dr. Zhang dated March 10, 2022, which stated that his primary diagnosis was "mixed depressive and anxiety disorders."  Dr. Zhang further wrote that, "Due to depression and anxiety, Mr. Li cannot mentally do his job. Currently it is not predictable for how long these limitations will last."

Dr. Zhang's statement was supported by a two-page list of Li's appointments with the SinoUnited Health Clinic in Shanghai, where Dr. Zhang worked.  It indicated that Li was treated at the clinic on 27 occasions between March 1 and August 5, 2021 with physiotherapy in the rehabilitation department.  One of those early appointments was with the orthopedics department.  On August 5, Li received a physiotherapy treatment, had a consultation with gastroenterology, and had his first consultation in the psychiatry department with Dr. Zhang. Between August 5, 2021, and April 8, 2022, Li had eight visits with Dr. Zhang -- i.e., approximately one visit per month. Following August 5, he also had 35 more physiotherapy sessions,

a gastrocolonsocopy on August 24, and a dermatology consultation on October 21.

Dr. Zhang's treatment notes for the period between August 5, 2021 and April 8, 2022, were added to Li's disability claim file soon thereafter.  They consist of one page of notes in Chinese and English per appointment.  In her treatment of Li between August 2021 and April 2022, Dr. Zhang documented Li's depressed mood, anxiety, negative thinking, and struggles with sleep.  Li saw Dr. Zhang twice in August, during which time Dr. Zhang prescribed the anti-depressants Seroxat and Trazodone. Dr. Zhang did not see Li again until November 29, at which point she changed his medication to Clonazepam (for panic disorders) and Cymbalta (for depression and anxiety).  On December 9, she increased Li's Cymbalta dosage.  At that session, Dr. Zhang reported that Li was depressed, upset, and crying easily, but that his sleep (although still "shallow") had improved.  On January 10, 2022, she recorded his depression and anxiety as "partially improved" and his "crying decreased."

On February 9, Dr. Zhang lowered the Cymbalta dosage and added a prescription for quetiapine.  On March 10, Dr. Zhang described Li's hyperactivity as "improved," and noted that Li's thinking was "coherent."  Dr. Zhang again observed that Li's thinking was coherent on April 8, but also that Li was

experiencing depressed mood, anxiety, poor sleep (sometimes falling asleep at only 5:00 or 6:00 a.m.), and poor appetite. Dr. Zhang continued Li's prescriptions for Cymbalta, Clonazepam, and quetiapine at their then-existing levels. Li did not see Dr. Zhang again during the elimination period. His next session with her was a telephone follow-up on June 9, 2022.[1]

B.    First Unum's Initial Denial of Benefits

In its initial review of Li's application, First Unum noted that, "per" Li's employer, McKinsey, Li was receiving "sick pay / [short term disability]" through June 8, 2022. First Unum, noted, however, that it was "unclear" if Li would remain precluded from carrying out his occupational duties through the elimination period, and thus whether he would be entitled to long term disability benefits payable from June 8, 2022 onwards.

On April 21, First Unum requested copies of Dr. Zhang's treatment notes from August 2021 to the present. On May 2, First Unum emailed Li to ask him about the history of his condition and his current symptoms and other questions related to his claim for benefits. In response, Li stated that his symptoms had begun in "mid-2021" and referred First Unum to Dr.

---

[1]    Dr. Zhang's notes indicate that Li was unable to visit the clinic on June 9 due to the sudden closure of the residential area, apparently a reference to a COVID-19 closure.

Zhang's treatment notes for a "detailed description" of his symptoms.

On May 9, First Unum requested from Li copies of any new treatment notes that were available from Dr. Zhang for May and June.  Receiving no response, First Unum made the same request on June 3.  On June 8, the elimination period for Li's long term disability benefits ended.  Several days later, on June 12, Li provided First Unum with Dr. Zhang's treatment note from the June 9 telephone session.  Dr. Zhang's June 9 note describes Li's continued struggles with anxiety, concentration, and sleep.  It also notes that she increased Li's Clonazepam prescription.

On June 16, First Unum reported to Li that it had completed an initial review of Li's materials and sought additional clarification.  First Unum asked Li whether he was receiving psychotherapy in addition to the "medication management" that Dr. Zhang was providing, and whether Dr. Zhang was "still providing disability restrictions" because her "notes did not indicate any work or disability status."  In response, Li informed First Unum that he was not receiving psychotherapy and provided an updated "disability/out of work note from Dr. Zhang."  Dr. Zhang's note -- dated June 20 and marked as a "follow up note" to the June 9 session -- states: "The patient visited by telephone on 6/9, and was not suitable for work at

that time.  He was recommended to continue rest and gradually
adjust his emotional state through drug therapy and cognitive-
behavioral fine tuning."

Having received the requested information from Li, First
Unum asked Registered Nurse Allyce Hawkes to review Li's medical
records.  Nurse Hawkes conducted a review on June 29.  After
summarizing Dr. Zhang's treatment notes from August 5, 2021 to
June 9, 2022, she concluded that it was "unclear" what the
etiology was for Li's anxiety and depression and whether Li's
anxiety and depression rose to a level that would "support a
decrease in functional capacity."  Nurse Hawkes reasoned that
while Li's symptoms were consistently documented and Li had
undergone multiple medication changes, his treatment had been
limited to once a month and Dr. Zhang's records did not "provide
clear insight" into Li's functional capacity.  She also noted
that Dr. Zhang's treatment notes included observations that Li
was able to complete some tasks including volunteering, caring
for pets, and limited cooking.

First Unum next had Dr. Alex Ursprung, Ph.D., contact Dr.
Zhang.  In a letter dated July 1, Dr. Ursprung wrote to Dr.
Zhang that, based on his initial evaluation of Dr. Zhang's
treatment notes, "Mr. Li would not be precluded from attempting
to return to his occupational duties."  Dr. Ursprung noted,

among other things, that Dr. Zhang's own treatment notes observed that Li's cognition was intact, that Li could do some volunteer work, and that Li's treatment plan had been limited to monthly visits with Dr. Zhang.  He asked Dr. Zhang whether she agreed that Li had not been precluded from working due to a psychiatric disorder from between December 9, 2021 and June 8, 2022, "and beyond," and, if not, to discuss the specific psychiatric restrictions and limitations that would prevent Li from working.

Dr. Zhang responded in a letter dated July 11, 2022.  She stated that she did not agree with Dr. Ursprung's opinion.  Dr. Zhang noted that Li's job demanded "great motivation, high attention, and speedy thinking," and that Li's "function in all these aspects has been greatly impaired."  She additionally noted that her description of Li as having "coherent thinking" was to suggest that Li had a "non-psychosis problem" and that Li had had "a bad experience in psychotherapy" and for that reason was not willing to engage in it again.  Finally, while Dr. Zhang had encouraged Li to keep a regular lifestyle as much as possible, including by recommending that he do some volunteer work when feasible, she ultimately believed that "his depression and anxiety still prevent him from working."

Having received this letter, Dr. Ursprung provided a written assessment of the medical evidence on July 12. Reviewing Dr. Zhang's treatment notes, he concluded that:

> In my opinion, based on the data I have reviewed, Mr. Li would not be precluded from attempting to return to his occupational duties. There is no data in the file to suggest functional impairment. His mental status exam reference symptoms but cognition is intact, and the records do also note some volunteer work. Treatment is not frequent. I would expect an impairing psychiatric disorder to be addressed by at least every other week psychotherapy as well as monthly medication management. There is no indication in the records that Mr. Li cannot appropriately maintain social interaction or cognitive effort.

Dr. Ursprung further summarized Dr. Zhang's July 11 letter and concluded that the letter did not change his opinion of Li's ability to return to work. He stated that an independent medical examination ("IME") was not necessary, because "[t]here is sufficient information in the file to reasonably determine the insured's capacity." Dr. Ursprung recommended obtaining a second opinion from a behavioral health Designated Medical Officer.

First Unum selected Dr. Audrey Longson, D.O., board certified in psychiatry, to provide that second opinion. Dr. Longson, in a July 14 review, agreed with Dr. Ursprung's conclusion that Li "would not be precluded from returning to his occupational duties." She reasoned that Dr. Zhang's treatment notes "lack comprehensive mental status examination findings and

10

there are no psychotherapy records." She further opined that
the "lack of participation in regular psychotherapy would not be
consistent with a severe functional impairment due to a
psychiatric condition." In sum, she stated that Li "has
complained of severe psychiatric symptoms, and [Dr. Zhang] has
opined that these complaints preclude [Li] from working[,]" but
"the treatment plan outlined in the medical records is
inconsistent with the reported psychopathology level."

Following these reviews by Nurse Hawkes, Dr. Ursprung, and
Dr. Longson, First Unum denied Li's claim by letter dated July
19, 2022. In the letter, First Unum summarized its decision
that Li's "regular occupation" was "Consultant," which required
duties of directing, controlling, or planning activities of
others; influencing people in their opinions, attitudes, and
judgments; and making judgments and decisions. The letter then
summarized the medical evidence and the peer reviews. First
Unum emphasized that Dr. Zhang's treatment records did not
"contain clinical evidence of severe/persistent psychiatric
pathology that would be expected to restrict functionality," and
Dr. Zhang's "treatment plan" was "inconsistent with [Li's]
reported psychopathology level." It concluded that the medical
information submitted did not support a finding that Li was

limited from performing the material duties of his occupation on a full-time basis through the elimination period and beyond.

    C.   Li's First Appeal

On August 29, 2022, Li appealed First Unum's determination by email.  He requested that an independent medical review be part of the appeal process.  He did not provide any additional medical records.  He did, however, copy Dr. Zhang on the email, who Li said "helped" him to "interpret" First Unum's July 19 letter and to "raise questions."  Among other things, Li clarified that he had misunderstood First Unum's earlier question and clarified that he was receiving psychotherapy treatment as part of his sessions with Dr. Zhang (but not with any other provider).  First Unum confirmed by letter dated August 30 that it had received Li's request for an appeal review of his disability claim.

Also on August 30, First Unum asked Dr. Peter Brown, M.D., board certified in psychiatry, to conduct a peer review and analyze whether the available medical records suggested restrictions and limitations that would preclude Li from working during the elimination period and onward.  Dr. Brown concluded that the available medical information supported restrictions and limitations for a period from December 9, 2021 to March 10, 2022, based on "the need to evaluate, initiate treatment and

stabilize [Li's] reported symptom exacerbation."  Further restrictions and limitations, in Dr. Brown's view, however, were not supported beyond that period.

Dr. Brown reasoned that the available medical records from Dr. Zhang were "extremely terse and do not give a full psychiatric history or address either job-related stressors or other contributing factors including the contemporaneous, strict COVID lockdown."  In addition, Dr. Brown reported that, "[i]f severe and ongoing impairment were present one would reasonably expect further adjustments in medication and, at a minimum, discussion of the risks and advantages of additional treatment including psychotherapy."  He further opined that Li's concern about a prior "bad experience" with psychotherapy did not justify foregoing the treatment, because "[s]uch experiences are not uncommon" and "do not significantly predict subsequent benefit from psychotherapeutic treatments that focus on symptom reduction and improvement of coping skills."  Finally, Dr. Brown stated that "[n]o additional medical activity" was warranted "at this time."

First Unum provided Li with Dr. Brown's peer review for comment on September 6.  In a letter dated September 15, Li's current counsel explained to First Unum that it recently had been retained by Li and requested an extension to April 15, 2023

13

to prepare an appeal.  First Unum denied that request by letter
dated September 21, and Li's counsel then withdrew Li's August
29 appeal.

D.   Li's Second Appeal

Li filed a renewed appeal on February 7, 2023.  The appeal
included: an affidavit from Li; two letters from Dr. Zhang, one
dated December 29, 2022 and one January 30, 2023; and a
neuropsychology evaluation performed remotely by Dr. Wilfred van
Gorp, Ph.D., on December 5, 2022.  On February 8, Li submitted
two unsigned "witness statements" from his aunt and a co-worker.

Among those newly submitted materials, Dr. Zhang's January
30, 2023 letter opined that Li's "condition causes deficits in
his attention; concentration; memory; recall; and verbal
fluency."  As a result, she reasoned, Li would have difficulty
concentrating and solving complex problems at work and would
require frequent breaks and absences.  Dr. Zhang further stated
that Li was currently taking clonazepam, quetiapine, and Lexapro
(which, she said, she had prescribed in lieu of Cymbalta since
November 2022).  Dr. Zhang concluded, based on her experience as
a psychiatrist and her "clinical familiarity with [Li] and his
history," that Li's condition was unlikely to improve and that
he was disabled and "unable to work in his occupation or any
other occupation."

Attached to Dr. Zhang's December 2022 letter were new treatment notes from August 10, September 20, October 13, November 28, 2022.  Those treatment notes continued to document Li's depressed mood, anxiety, lack of motivation, and sleep troubles.  They also noted additional changes in Li's medication plan.  At the November 2022 session, Dr. Zhang recommended Li receive "counseling."

Dr. van Gorp's neuropsychology report was based on a telehealth evaluation conducted on December 5, 2022.[2]  He reviewed Li's history of depression, which he reported began in Li's 20s, and Li's "current depressive episode."  Dr. van Gorp further noted that Li told him "that he actively considers plans for how to commit suicide," and he observed, based on Li's "Personality Assessment Inventory," that Li "views himself in an overly negative manner, with few positive qualities."

Dr. van Gorp used tests to evaluate Li on several metrics, including effort and motivation (which Dr. van Gorp described as, "good"), intellectual functioning ("borderline" in "processing speed" for his age), attention and concentration

---

[2]  Dr. van Gorp also tested Li on October 20 and 21 but only the data from the December 5 session was "used for valid clinical interpretation."  Dr. van Gorp's report states that testing was "discontinued" in the first two sessions because Li was "so depressed . . . that he was unable to put forth sufficient effort," and, in his view, would not have been able to "finish[] the test."

("significantly impaired"), learning and memory ("significantly impaired"), executive function ("extremely low"), and emotional and personality functioning ("significant elevation across several scales").  He also found Li to score average or better in several metrics, including: working memory ("average"); complex attention ("superior"); phonemic fluency ("average"); non-verbal abstract problem-solving ("superior"); word recall and complex figure reproduction ("average"); and concept formation and mental flexibility ("average").

Based on his testing, Dr. van Gorp diagnosed Li with "Major Depressive Disorder, Recurrent, Severe," and "Generalized Anxiety Disorder."  He stated that he agreed with Dr. Zhang that due to Li's "significant depression and his cognitive impairment involving psychomotor speed, attention, memory, and verbal fluency, he is unable to work in his own occupation or any other occupation."  He also noted that he had "urged" Li to pursue further appropriate psychotherapy treatment.

E.   First Unum's Appeal Review

In response to Li's renewed appeal and newly filed materials, First Unum asked neuropsychologist Dr. Malcolm Spica, Ph.D. to review Dr. van Gorp's report, which Dr. Spica did on February 15, 2023.  Dr. Spica reported that "the limited information regarding validity from the presented examination

16

. . . suggests symptom exaggeration."  Among other things, he
quoted Dr. van Gorp's comment that Li "views himself in an
overly negative manner" and stated: "this appears to be a
reference to the fact that [Li] scored far beyond the normal
range on the Negative Impression Management index (>99th
percentile), which may actually indicate the claimant engaged in
a symptom magnification or malingering."

Even without the potential for symptom exaggeration, Dr.
Spica determined that "Dr. van Gorp's testing demonstrated that
[Li] does not exhibit converging or consistent evidence of
neurocognitive dysfunction rising to the level of impairment[.]"
He reasoned that while Li did score low by some measures on Dr.
van Gorp's tests, he scored high or average on others, and "the
patterns of performance reflected only performance variability,
rather than persisting impairments."  He concluded that
"limitations or restrictions are not supported on neurocognitive
bases."

Finally, Dr. Spica acknowledged that Dr. van Gorp had cited
"psychological factors" as "influencing [Li's] experience of
cognitive dysfunction."  But Dr. Spica again expressed his view
"that persisting neurocognitive dysfunction was not
substantiated by the quantified testing," since Li "provided
performances within normal limits across domains."

On February 17, Dr. Brown reviewed the newly submitted letters and treatment notes from Dr. Zhang, as well as Dr. van Gorp's report and Dr. Spica's review.  He observed that both Dr. Zhang and Dr. van Gorp had noted referrals for behavioral health treatment in "fourth quarter 2022," but that, apparently, no such treatment had been provided.  Dr. Brown concluded that the additional materials did not allow him to change his original conclusion that Li had not suffered restrictions and limitations on his ability to work throughout the elimination period and beyond.

F.   Li Supplements Appeal Record in February 2023.

In a letter dated February 21, 2023, First Unum provided Li with Dr. Brown's and Dr. Spica's peer reviews.  Li then submitted statements from Dr. van Gorp and Dr. Zhang (both dated February 27, 2023), as well as new treatment notes from Dr. Zhang for December 29, 2022, January 30, 2023, and February 15, 2023.

On March 2, Dr. Spica reviewed the new material from Dr. van Gorp and concluded that it did "not alter [his] previous opinion in this case."  He wrote that the "factual errors" that Dr. van Gorp asserted he made were "either misunderstandings of what I wrote or differences of opinion."  He further stated that "Dr. van Gorp's explanations of the 'errors' were not

substantive and did not alter my analysis of the examination data." In addition, he pointed out that "Dr. van Gorp did not provide additional evidence supporting cognitive disorder for Mr. Li's case." In sum, he concluded that he did "not find compelling evidence from a neurocognitive standpoint that the treatment could not be pursued concurrent with work."

Dr. Brown similarly reviewed the new material from Dr. Zhang on March 6. He acknowledged that "Dr. Zhang believes that [Li] demonstrates ongoing functional impairment due to a severe psychiatric condition." Dr. Brown reasoned, nevertheless, that the information included in Dr. Zhang's new materials was "entirely consistent with previous information analysis and does not allow me to change my conclusions as previously stated." He reported that "[n]o additional medical activity" was necessary.

First Unum provided the new reports of Dr. Spica and Dr. Brown to Li's attorney in a letter dated March 6. In its letter, First Unum told Li that it "did not find support for restrictions and limitations that would limit [Li] from performing [his] occupational demands through the elimination period." It informed Li of his right to review and respond to First Unum's materials, reiterating that any new information Li provided "should be time relevant to when the elimination period ended on June 8, 2022."

G.   Li Requests an IME.

Li responded in a letter dated March 21, and "request[ed]" that First Unum "conduct an IME."  Li also provided three additional documents: a March 16 treatment note from Dr. Zhang; a March 18 letter from Dr. Zhang; and a March 18 report from Dr. van Gorp.

In response to Li's request for an IME, First Unum asked its peer reviewer Dr. Brown to recommend what an IME should consider and include.  On March 22, Dr. Brown recommended a "psychiatric IME by US based forensic psychiatrist with experience in disability evaluation."  He further stated that "A virtual evaluation is acceptable but should include [Minnesota Multiphasic Personality Inventory – Third Edition ("MMPI-3")] administration with appropriate protocol as per manual."

On First Unum's behalf, a third party, Dane Street, scheduled Li for an IME on April 24.  First Unum advised Li by email on March 29 that an interpreter could be arranged if necessary.  On March 31, Li's counsel objected to the virtual IME, and requested that First Unum either cancel the scheduled examination or schedule an in-person examination with a native-Mandarin speaker.

Li's counsel also attached a March 31 letter from Dr. Zhang, in which she explained why, in her view, an IME should be

20

conducted in-person and with a Mandarin-speaking local psychiatrist.  Dr. Zhang again stated that she believed that "any attempt" by Li to "resume work would result in decompensation, treatment setbacks, and a higher risk of self-harm or suicide."

By letter dated April 3, First Unum informed Li that it was working to reschedule the IME due to "time zone differences" and the "need for a translator."  In a letter dated April 7, Li's counsel notified First Unum that they had scheduled an in-person psychiatric examination with a Mandarin-speaking psychiatrist that they chose, Julia Li, M.D., on April 10, 2023.

First Unum accepted.  It acknowledged in a letter dated April 10, 2023 that Li had requested that First Unum cancel the virtual IME and that Li was attending an in-person IME with Dr. Julia Li that day.  First Unum extended the deadline to complete its review of Li's appeal by 45 days, stating that the extension would "begin after [it] receive[d] the records from the April 10, 2023 [IME]."

On April 14, however, Li's counsel informed First Unum that the in-person examination had been delayed to April 21, 2023, and that it would be conducted by a different doctor, Dr. Peifen Yao, M.D.  In a letter dated April 17, First Unum revised its

extension of 45 days to begin when it received the examination report from Dr. Yao.

By letter dated May 2, 2023, Li's counsel sent Dr. Yao's two-page IME report to First Unum.  Dr. Yao's report does not suggest that he administered an MMPI-3, as Dr. Brown had recommended.  Instead, Dr. Yao stated that he reviewed Dr. Zhang's medical records and Dr. van Gorp's evaluation reports, and that he agreed with "their findings and diagnosis."  He further wrote that he "conducted [his] own face to face examination" but he did not describe any specific observations or findings beyond saying that Li "[p]resented with very depressed mood, lack of interest, and low self-esteem."  He then recounted what Li had apparently told him of his psychological and physical symptoms in the past two years.  Among other things, this included "poor sleep quality [and] anxiety, accompanied by the emergence of negative suicidal ideation and self-harm."

Li also submitted additional medical records with Dr. Yao's report, including Dr. Zhang's responses to questions that Li's counsel posed concerning the report, dated May 2, 2023.  Among other things, Dr. Zhang reiterated her view stated in earlier letters (of March 18 and March 31) that a return to work by Li

would "interfere with treatment and would pose an unreasonable risk of harm . . . as he continued psychiatric care."

That same day, Dr. Brown reviewed and responded to the new information, including Dr. Yao's report and Dr. Zhang's May 2 letter.  He concluded that "[w]hile both [Dr. Yao and Dr. Zhang] conclude that there is evidence of chronic, severe and ongoing psychiatric impairment, changes in treatment under consideration appear, at best, limited."  He reasoned that the new information was "entirely consistent with previous information analysis and does not allow me to change my conclusions."

By letter dated May 3, First Unum provided Dr. Brown's supplemental review to Li, informed Li that he had until May 18 to respond to this new information, and reiterated, per its April 17 letter, that First Unum's deadline to determine the appeal was June 16, 2023 -- i.e., 45 days from May 2.

Li's counsel called First Unum on May 9 and May 10, seeking an extension of time to submit additional information because Li was scheduled for another examination.  In the May 10 voicemail, counsel for Li stated that it was Dr. Brown who had "recommended" an "IME" and that counsel was "following through with this."  Both requests were denied by First Unum in letters of May 9 and May 10.

23

In the May 9 letter, First Unum stated that Li's "response" to First Unum's new materials must be "received by us no later than May 18, 2023."  In the May 10 letter, First Unum stated, correctly, that it was Li who had originally requested an IME, and that Dr. Brown's recommendations were made in response to that request.  First Unum explained that Li had already been granted an extension to conduct an IME of his choosing, but that it was "not in agreement with [Li's counsel's] request for an extension of time to send [Li] for another examination."

In a letter dated May 12, 2023, Li's counsel again asserted that the second IME was necessary because First Unum "demanded an MMPI-3 and in the interest of a good faith dialogue, we are seeking to follow [that] directive."  First Unum reiterated in a May 16 dated letter that "[t]he medical consultants that reviewed [Li's] claim file did not conclude that an IME was needed in order to review your client's functional capacity during the time relevant period."  And it stated again that its deadline was firm: Li had until May 18 to respond to Dr. Brown's supplemental review, and First Unum denied any request for an "extension of time to send [Li] for another examination."

H.    Second IME with MMPI-3

In a letter dated May 18, Li's counsel enclosed a report of a virtual IME conducted on May 16, 2023 by Dr. Bahrach Talei,

Psy.D., who is based in California.  Dr. Talei conducted a clinical interview of Li, an MMPI-3, and a review of Li's medical records.  He stated that the purpose of his examination was "to assess [Li's] current level of functioning and his ability to consistently maintain employment."

In describing Li's medical history, Dr. Talei noted that Li "has been psychiatrically hospitalized on three occasions" including "around the same time when he started his employment at McKinsey[.]"  He stated that Li worked at McKinsey "in minimal fashion during times of increased depression."  But he noted that Li had experienced his "biggest trauma" in 2021 when he witnessed his long-term partner of eight-years "engaging in inappropriate activity with another person," and that he was currently suffering from symptoms of lack of motivation, sleep disturbance, problems with memory, and feelings of hopelessness, among others.  Dr. Talei found that Li sometimes "sobbed uncontrollably," for example when discussing his cat's death in 2020.

Li produced scorable responses to all the MMPI-3 items. Among other things, Dr. Talei found that Li "is at risk for current suicidal ideation and attempts," and that Li reported a "diffuse pattern of cognitive difficulties[,] including memory problems, difficulty with attention and concentration, and

possible confusion." In summary, Dr. Talei concluded that the
historical treatment records, including letters and records of
Dr. Zhang from December 2022 to May 2023, MMPI-3 assessment
results, and descriptions provided by Li were all consistent
with the diagnosis of major depressive disorder and post-
traumatic stress disorder ("PTSD"). Dr. Talei concluded that Li
was "unable to engage in any employment in a consistent manner,"
and he recommended that Li continue psychiatric treatment and
resume "psychotherapeutic intervention with a new provider."

I.    First Unum's Appeal Decision

By letter dated May 30, First Unum determined that its
decision to deny Li's claim had been correct -- i.e., that Li
was not limited from performing the duties of his occupation
through the elimination period. First Unum's appeal decision
summarized the appeal process and the conclusions of its peer
reviewers, Dr. Brown and Dr. Spica.

First Unum reasoned that Dr. Zhang's records were "terse"
and did not "give a full psychiatric history," and her treatment
plan "had been limited to monthly medication management with a
modest, stable psychotropic regimen since February 9, 2022." It
stated that if Li had truly suffered "severe and ongoing
impairment," it would have expected to see "further adjustments

26

in medication and, at a minimum, a discussion of the risk and advantages of additional treatment including psychotherapy."

First Unum further noted that Dr. van Gorp's testing had indicated that Li may have "engaged in a symptom magnification or malingering."  It acknowledged that Dr. van Gorp had cited psychological factors as potentially influencing Li's experience of cognitive dysfunction, but it concluded that persisting neurocognitive dysfunction "was not substantiated by the quantified testing."

First Unum stated that it had granted Li an extension of time to go to an examiner of his choosing for an IME, and that it reviewed the report from Dr. Yao and Dr. Zhang's additional responses.  First Unum endorsed Dr. Brown's view developed in response to these materials that changes in treatment under consideration appeared "limited" at best.  Having considered the new materials, First Unum remained convinced that Li did not suffer restrictions and limitations preventing him from performing his occupational duties through and beyond the elimination period.

Finally, regarding the report from Dr. Talei, First Unum stated that it "reflect[ed] historical information collected from [Li] via a zoom meeting, a records review and information about [Li's] current status."  First Unum concluded that Dr.

27

Talei's "report does not contain any new time relevant clinical data related to your client's elimination period," i.e., the period from December 8, 2021 to June 8, 2022.  First Unum stated that if counsel "believed [Li] maintained insurance coverage through the date of [Dr. Talei's] exam, [Li could] submit a new claim for consideration."

J.    Li's Complaint

On August 8, 2023, Li responded to First Unum's denial of his administrative appeal by filing this action.  He seeks a declaration of entitlement to benefits under 29 U.S.C. § 1132(a)(1)(B) and for attorneys' fees under 29 U.S.C. § 1132(g).  Li claims that he is owed a monthly benefit of the policy monthly maximum, $35,000, from June 8, 2022 onwards until he turns 65 years old.

On April 15, 2024, the case was reassigned to this Court.  On June 11, the parties filed a joint pretrial order for a bench trial.  On July 19, the parties stipulated to have the case resolved on a paper record.  That record became fully submitted on October 4, 2024.[3]

---

[3]  On July 19, Li submitted a thirty-page trial brief, as well as a nearly seventy-page document titled "Proposed Findings of Fact and Conclusions of Law" ("Proposed Findings").  First Unum argues that the Court should disregard the Proposed Findings because Li used them to exceed the parties' briefing page limits.

## Discussion

At the outset, the parties dispute what standard of review applies to the challenge to First Unum's denial of benefits. For the reasons that follow, the Court reviews the First Unum decision under the arbitrary and capricious standard. Turning to the merits, First Unum's decision to deny Li's claim for benefits was supported by substantial evidence.

## I.  Standard of Review

ERISA § 1132(a)(1)(B) provides that a "civil action may be brought . . . by a participant or beneficiary [of a covered ERISA plan] . . . to recover benefits due to him under the terms of his plan."  Generally, a court reviews a plan administrator's decision to deny ERISA benefits under § 1132(a)(1)(B) de novo. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); see also Hobson v. Metro. Life Ins. Co., 574 F.3d 75, 82 (2d Cir. 2009).  To obtain a more deferential review, written plan documents must grant a plan administrator discretionary authority to determine eligibility for benefits.  Hobson, 574 F.3d at 82.  Even then, however, a plan administrator's failure

---

In fairness to its adversary, Li should have advised First Unum of its plan to file the Proposed Findings.  Any prejudice to First Unum is limited, however, since it is the administrative record that provides the basis for this Opinion's findings and conclusions.

to strictly comply with applicable ERISA regulations will ordinarily require <u>de novo</u> review.  <u>Halo v. Yale Health Plan, Dir. of Benefits & Recs. Yale Univ.</u>, 819 F.3d 42, 57-58 (2d Cir. 2016).  As discussed below, because the ERISA plan grants First Unum discretion and First Unum complied with the relevant regulations, arbitrary and capricious review applies.

    A.    The Plan Grants First Unum Discretion.

     Where "written plan documents confer upon a plan administrator the discretionary authority to determine eligibility," a court may "not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious." <u>Hobson</u>, 574 F.3d at 82 (citation omitted).  To trigger the more deferential standard of review, a benefit plan need not "actually use the words 'discretion' or 'deference,'" but the language must be sufficiently clear in communicating that the administrator reserves discretion to interpret and apply the plan.  <u>Nichols v. Prudential Ins. Co. of Am.</u>, 406 F.3d 98, 108 (2d Cir. 2005).  Because "the plan administrator bears the burden of proving that the arbitrary and capricious standard of review applies," any "ambiguity in the wording of the policy should be resolved against" the administrator.  <u>Kinstler v. First Reliance Standard Life Ins. Co.</u>, 181 F.3d 243, 252 (2d Cir. 1999).

30

"ERISA itself does not make plain where one looks to find the 'terms' of an ERISA plan, other than to mandate that '[e]very employee benefit plan shall be established and maintained pursuant to a written instrument.'" <u>Silverman v. Teamsters Loc. 210 Affiliated Health & Ins. Fund</u>, 761 F.3d 277, 286 (2d Cir. 2014) (quoting § 1102(a)(1)).  The Second Circuit has identified two documents that, depending on the circumstances, may set forth

> plan terms: (1) the governing plan document, <u>i.e.</u>, the trust agreement or contract under which the plan was formed; and (2) the summary plan description ("SPD"), a plain-English summary of plan benefits and obligations that the plan administrator must file with the United States Department of Labor and provide to each participant and beneficiary of the plan.

<u>Id.</u> at 286–87.  In some cases, "the SPD may be the only plan document."  <u>Id.</u> at 287 (citation omitted).  But where both the governing plan document and the SPD set out plan terms, both documents "must be made available by the plan administrator 'for examination by any plan participant or beneficiary.'"  <u>Id.</u> (quoting 29 U.S.C. § 1024(b)).  In short, "the documents that lay out the plan terms must be readily accessible in written form to all covered employees."  <u>Id.</u>

Here, First Unum issued to McKinsey the Policy, effective July 1, 1987.  The Policy explains that it is a "complete contract" that consists of: "a. all of the pages; b. the policy

31

specifications; c. the attached application of the policyholder; d. each employee's application for insurance."  A "Certificate of Coverage" explains to employees of McKinsey that First Unum has welcomed McKinsey as a client and provides a "plain English" overview of the Policy to those employees.  The Certificate of Coverage and the Policy contain many of the same terms.  The Certificate of Coverage explains, however, that if its terms and the terms of the Policy "differ," the Policy's terms govern.

The "Additional Summary Plan Description Information" is attached to the Certificate.  It explains that the Policy, Certificate, and the Additional Summary Plan Description Information document together constitute the ERISA Plan:

> If this [P]olicy provides benefits under a Plan which is subject to [ERISA], the following provisions apply. These provisions together with your [C]ertificate of [C]overage constitute the summary plan description ["SPD"].  The [SPD] and the [P]olicy constitute the Plan.  Benefit determinations are controlled exclusively by the [P]olicy, your [C]ertificate of [C]overage, and the information in this document.

The SPD also explains that McKinsey is the Plan Administrator and named fiduciary of the Plan, "with authority to delegate its duties."  It further states that benefits are "administered by [First Unum] and provided in accordance with the insurance policy issued to the Plan."  In its role as Plan Administrator, McKinsey delegated to First Unum and its affiliate, Unum Group, "discretionary authority to make benefit

determinations under the Plan." The SPD explains that "Benefit determinations include determining eligibility for benefits and the amount of any benefits, resolving factual disputes, and interpreting and enforcing the provisions of the Plan."

In addition, the SPD grants the employer, McKinsey, "the right, in its sole and absolute discretion, to amend, modify, or terminate, in whole or in part, any or all of the provisions of this Plan." McKinsey as employer, however, cannot unilaterally alter the Policy: the SPD notes that "the Employer may request a [P]olicy change," but "[o]nly an officer or registrar of [First Unum] can approve a change," and any "change must be in in [sic] writing and endorsed on or attached to the [P]olicy." This comports with language in the Policy, which explains that it "may be changed in whole or in part," but only an officer or registrar can approve a change and "approval must be in writing and endorsed on or attached to this [P]olicy."

Reviewing these terms, the Plan unambiguously provides First Unum with discretionary authority to determine whether a claimant, such as Li, is entitled to benefits. Li disagrees, but his arguments fail.

Relying on CIGNA Corp. v. Amara, 563 U.S. 421 (2011), Li first contends that the SPD cannot be the means by which legal rights are created. Li is mistaken. The Amara Court addressed

33

whether an employer had given employees adequate notice of a
change to its pension plan.  The employer's ERISA plan did not
expressly incorporate the terms of the SPD, and the Court
"simply did not address whether summary plan description terms
could be enforced when the written instrument expressly
indicated that they should be."  Tetreault v. Reliance Standard
Life Ins. Co., 769 F.3d 49, 56 (1st Cir. 2014).  Thus, the
following statement in Amara -- that SPDs, "important as they
are, provide communication with beneficiaries about the plan,
but . . . their statements do not themselves constitute the
terms of the plan", 563 U.S. at 438 -- has little relevance
where, as here, the language in the written plan documents
expressly state that the SPD is part of the Plan.

As the Second Circuit has explained, an ERISA plan may
include multiple documents, including an SPD.  Silverman, 761
F.3d at 286.  And where SPDs are expressly incorporated into an
ERISA plan, their terms are enforceable as part of the ERISA
plan.  This is true even though the language of incorporation
appears only in the SPDs themselves.  See, e.g., Aschermann v.
Aetna Life Ins. Co., 689 F.3d 726, 729 (7th Cir. 2012) ("There
is no reason why an employer cannot make a summary plan
description be part of the plan itself."); Eugene S. v. Horizon
Blue Cross Blue Shield of N.J., 663 F.3d 1124, 1131 (10th Cir.

2011) ("[A]n insurer is not entitled to deferential review
merely because it claims the SPD is integrated into the Plan.
Rather, the insurer must demonstrate that the SPD is part of the
Plan, for example, by the SPD clearly stating on its face that
it is part of the Plan."); see also Tetreault, 769 F.3d at 56
("[E]very court that has considered the issue has held that
Amara poses no automatic bar to a written instrument's express
incorporation of terms contained in a summary plan
description."); Tietjen v. Unum Life Ins. Co. of Am., No.
16cv7021 (JMF), 2017 WL 4286317, at *2 (S.D.N.Y. Sept. 26,
2017).

Second, Li points to decisions holding that an SPD's terms
are unenforceable if its terms conflict with the Plan itself.
See, e.g., Park Ave. Aesthetic Surgery, P.C. v. Empire Blue
Cross Blue Shield, No. 19cv9761 (JGK), 2021 WL 665045, at *6
(S.D.N.Y. Feb. 19, 2021). These cases have limited relevance,
however, when the SPD is a component of the Plan. See Eugene
S., 663 F.3d at 1131.

In any event, Li has failed to show that the SPD conflicts
with the Policy. Li first asserts that the SPD and the Policy
conflict because the Policy states that it is comprised of
certain documents that constitute the "complete contract" --
i.e., the complete Policy -- and the SPD is not one of them.

35

There is no dispute, however, that the Policy constitutes the complete contract between First Unum and McKinsey. Nothing in the Policy suggests, however, that the SPD cannot be a component of the ERISA Plan.

Second, Li argues that the SPD conflicts with the Policy's amendment procedure. Not so. Both the Policy and SPD explain that amendments may only be made by a representative of First Unum and in a writing attached to the Policy. Placing certain Plan terms, including those on benefit determinations, in the SPD was not an amendment of the Policy; the Policy is silent on how benefit determinations will be made.

Finally, Li argues that First Unum is collaterally estopped from arguing that it has discretion over benefit decisions. Li relies on a decision that applied de novo review to the denial of benefits under a First Unum policy that is apparently identical in all material terms to the policy at issue here. See Forman v. First Unum Life Ins. Co., 469 F. Supp. 3d 367 (E.D. Pa. 2020). Forman treats the Policy as the sole plan document and concludes that "the Policy and SPD are in conflict in that the Policy does not include a grant of discretion to First Unum but the SPD does." Id. at 371.

In invoking Forman, Li relies on the doctrine of nonmutual offensive collateral estoppel, which is a form of issue

36

preclusion.  The doctrine "precludes a defendant from relitigating an issue the defendant has previously litigated and lost to another plaintiff."  Bifolck v. Philip Morris USA Inc., 936 F.3d 74, 79 (2d Cir. 2019) (citation omitted).  Forman will not be followed here.  Its analysis is at odds with the Second Circuit's instruction that an SPD may set forth plan terms.  See Silverman, 761 F.3d at 286-87.

B.    Unum Complied with Applicable Regulations.

Li next argues that even if the Plan grants First Unum discretion to decide benefit eligibility, de novo review of its decision is required because First Unum failed to adhere strictly to 29 C.F.R. § 2560.503-1, which is the claims procedure regulation promulgated pursuant to ERISA.  See Halo, 819 F.3d at 57–58.  This argument fails.

ERISA explains that a claims administrator must:

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133(1)-(2) (emphasis supplied).  ERISA's claim procedure regulation, 29 C.F.R. § 2560.503-1, in turn sets forth minimum requirements for ERISA plan procedures pertaining to the

review of claims for benefits, including disability benefits.
See McQuillin v. Hartford Life & Accident Ins. Co., 36 F.4th
416, 418 (2d Cir. 2022); see also 29 C.F.R. § 2560.503-1(a); id.
§ 2560.503-1(h)(4).  The plan administrator bears the burden of
establishing strict compliance with these regulations.  Halo,
819 F.3d at 58.

Li contends that First Unum did not strictly comply with
two provisions of 29 C.F.R. § 2560.503-1.  They are 29 C.F.R. §§
2560.503-1(h)(3)(iii)("Subsection H"), which applies to the
substance of an appellate review, and 2560.503-1(g)(1)(vii)(A)
("Subsection G"), which pertains to the duty to explain an
initial adverse benefits determination.  His arguments fail.

1.    Subsection H

Subsection H of the regulations requires consultation with
appropriate experts during an appellate review of a benefit
determination.  It states that,

> in deciding an appeal of any adverse benefit
> determination that is based in whole or in part on a
> medical judgment, . . . the appropriate named
> fiduciary shall consult with a health care
> professional who has appropriate training and
> experience in the field of medicine involved in the
> medical judgment.

Id. § 2560.503(1)(h)(3)(iii)(emphasis supplied).  The
review on appeal must take "into account all comments,
documents, records, and other information submitted by the

claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination."   29 C.F.R. § 2560.503-1(h)(2)(iv).

During the appeal process, First Unum obtained peer reviews from Dr. Brown (a psychiatrist) and Dr. Spica (a neuropsychologist) of the Li benefits determination.   These medical experts provided updated evaluations to First Unum as Li submitted additional materials during his appeal.

Li contends that First Unum failed to adhere to Subsection H because a First Unum employee determined that Dr. Talei's report, which was submitted on the final day of the appeal period, was not time relevant and did not need to be reviewed by a healthcare professional.   The decision not to submit Dr. Talei's report to a medical expert did not violate Subsection H.

Subsection H does not require a health care professional to review every document submitted by an applicant.   Instead, it requires the plan administrator to take into account all materials submitted by a claimant and, in making an appeal decision based on a medical judgment, to consult with a health care professional with appropriate training.   See 29 C.F.R. § 2560.503-1(h)(2)(iv); id. § 2560.503(1)(h)(3)(iii).   First Unum did so.

        2.   Subsection G

    Subsection G requires that an initial adverse benefit

determination must include, among other things,

> [a] discussion of the decision, including an
> explanation of the basis for disagreeing with or not
> following . . . (i) The views presented by the
> claimant to the plan of health care professionals
> treating the claimant and vocational professionals who
> evaluated the claimant[.]

29 C.F.R. § 2560.503-1(g)(1)(vii)(A).  First Unum has shown that

it complied with Subsection G.  The initial denial of Li's claim

for benefits summarized the views of Dr. Zhang and of First

Unum's peer reviewers, and it articulated the basis for First

Unum's decision, including by explaining why it did not agree

with the views of Dr. Zhang.

    Li argues that First Unum failed to adhere strictly to the

regulations by not providing "any explanation for disagreeing

with the views of . . . Dr. Zhang regarding how work activity

would put Li at further risk of further decompensation,

suicidality, and self-harm," as described in Dr. Zhang's letters

of March 18, March 31, May 2, and May 20, 2023.  These letters

were sent after First Unum had issued its initial adverse

determination and therefore are not governed by Subsection G.

ERISA contains, however, a parallel notification requirement for

benefit determinations "on review."  It states that the "plan

administrator shall provide a claimant . . . of a plan's benefit
determination on review" with:

> A discussion of the decision, including an explanation
> of the basis for disagreeing with or not following:
> (A) The views presented by the claimant to the plan of
> health care professionals treating the claimant[.]

29 C.F.R. § 2560.503-1(j)(6)(i)(A) ("Subsection J").  Even if
the Court were to construe Li's argument regarding Subsection G
to concern Subsection J, First Unum has shown that it adhered to
that provision as well.

The first three of these four letters from Dr. Zhang were
timely submitted by Li and First Unum acknowledged receipt of
each of the three letters and addressed Dr. Zhang's views in
those letters.[4]  In his review of the May 2 letter, Dr. Brown
opined that, while Dr. Zhang concluded that there was "evidence
of chronic, severe, and ongoing psychiatric impairment, [any]
changes in treatment under consideration appear at best,
limited."  Dr. Brown thus concluded that "the additional
information" provided by Dr. Zhang was "entirely consistent with
previous information analysis and does not allow me to change my
conclusions."

First Unum provided Li with a copy of Dr. Brown's review by
letter dated May 3, and First Unum's May 30 appeal decision

---

[4] The letter from Dr. Zhang of May 20, 2023 was sent after the
May 18, 2023 deadline for Li's submissions.

relied on Dr. Brown's assessment, as well as that of Dr. Spica.
Specifically, First Unum summarized and endorsed Dr. Brown's
opinion that the records from Dr. Zhang were "extremely terse"
and "do not give a full psychiatric history."  It added that the
"[t]reatment of symptoms of anxiety and depression had been
limited to monthly medical management with a modest, stable
psychotropic regimen since February 9, 2022."

In short, First Unum has shown that its appeal process took
into account all of Dr. Zhang's timely submissions and provided
Li with its basis for disagreeing with her views.  That is
sufficient to comply with Subsection J.

II.  First Unum's Denial of Benefits Was Supported by
Substantial Evidence.

Under the arbitrary and capricious standard of review, a
court "may overturn an administrator's decision to deny ERISA
benefits only if it was without reason, unsupported by
substantial evidence or erroneous as a matter of law."  Hobson,
574 F.3d at 83 (citation omitted).  This is a "narrow" scope of
review, and a court is "not free to substitute [its] own
judgment for that of the insurer as if we were considering the
issue of eligibility anew."  Id. at 83-84 (citation omitted).
Substantial evidence is "evidence that a reasonable mind might
accept as adequate to support the conclusion reached by the
decisionmaker and requires more than a scintilla but less than a

42

preponderance." Miller v. United Welfare Fund, 72 F.3d 1066, 1072 (2d Cir. 1995) (citation omitted). Accordingly, the question is not whether the administrator made the "correct decision" but rather whether it "had a reasonable basis for the decision that it made." Hobson, 574 F.3d at 89 (citation omitted). A court's review under the arbitrary and capricious standard is limited to the administrative record. Miller, 72 F.3d at 1071. Li bears the burden of proving that he is eligible for disability benefits. See Critchlow v. First UNUM Life Ins. Co. of America, 378 F.3d 246, 256 (2d Cir. 2004).

A plan administrator is entitled to weigh the competing opinions of different medical experts, including the conflicting opinions of treating versus non-treating physicians. A court may not "require administrators automatically to accord special weight to the opinions of a claimant's physician." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). Nor may a court "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Id.

A plan administrator may accord less weight to subjective complaints of a claimant where the claimant fails to produce objective corroboration. Hobson, 574 F.3d at 88. According "weight to objective evidence that a claimant's medical ailments

43

are debilitating [guards] against fraudulent or unsupported claims of disability." Id.

Here, Li has failed to show that the decision to deny him benefits was either arbitrary or capricious. First Unum grounded its appeal decision in the opinions of its peer reviewers, Dr. Brown and Dr. Spica. In doing so, First Unum articulated why it disagreed with or did not need to follow the opinions of Dr. Zhang, Dr. van Gorp, Dr. Yao, and Dr. Talei. First Unum had notified Li in its initial denial of benefits that the primary objective evidence of Li's psychiatric disability would be a treatment plan that increased in intensity as time passed without reported improvement -- and that Dr. Zhang's treatment notes from before, during, and after the elimination period failed to provide such objective evidence. Even as Li submitted additional materials from Dr. Zhang, Dr. Brown continually expressed the view that Dr. Zhang's treatment plan had not changed in any material respect over the months that she treated him.

In essence, First Unum offered a reasoned analysis of the relevant record materials, and its decision to deny Li's appeal was supported by substantial evidence. See Miller, 72 F.3d at 1072. Grounded in its peer reviewers' assessments, it was not unreasonable for First Unum to conclude that the primary

44

objective evidence of Li's condition during the elimination period -- namely Dr. Zhang's treatment notes -- did not suggest that Li was suffering from a sufficiently severe disability that prevented him from returning to work.

In his challenge to First Unum's decision, Li has relied almost exclusively on his argument that de novo review of the decision is required.  Nonetheless, Li has listed several reasons why First Unum's decision was not supported by substantial evidence.  None prevails.

First, Li contends that First Unum's decision to not have a medical professional review Dr. Talei's report on grounds that it was not "time relevant" to Li's elimination period was arbitrary and capricious.  That decision, however, finds sufficient support in the record.

On its face, Dr. Talei's report states that its purpose is to assess Li's "current level" of functioning and his ability to maintain employment.  Dr. Talei does not claim that he reviewed Dr. Zhang's treatment notes from August 2021 through June 2022, nor does he otherwise opine on Li's condition during the elimination period.  Instead, he notes that he reviewed records dated between July 2022 to May 2023 -- all of which were created after the elimination period.  Accordingly, it was reasonable for First Unum to conclude that Dr. Talei's May 2023 report did

not provide or offer any analysis of "time relevant clinical data related to [Li's] elimination period."

Second, Li presses that First Unum acted arbitrarily and capriciously by instructing its peer reviewers to limit their assessment to the elimination period only. This contention has no support in the record. First Unum instructed both Dr. Ursprung and Dr. Brown to assess whether Li suffered restrictions and limitations precluding him from working throughout the elimination period and beyond. And as Li submitted additional assessments on appeal, First Unum had peer reviewers assess many of those materials as well.

Third, Li contends that First Unum's peer reviewers made assertions that were "demonstrably contrary to the factual record." He identifies four purported errors. The first is the peer reviewers' conclusion that Dr. Zhang's changes to Li's treatment "appear, at best, limited." There was ample support in the record for this conclusion.

The remaining three purported errors pertain to the reviewers' analysis of Dr. van Gorp's neuropsychological evaluation. They are the reviewers' conclusions that the results of that evaluation were "normal" and suggested symptom exaggeration; and that the reviewers required the presence of a neurocognitive disorder. Li misconstrues the record. It was Li

himself who introduced the issue of a cognitive impairment.
Li's attorney asked Dr. van Gorp to assess Li's "cognitive" and
emotional status.  Dr. van Gorp concluded, <u>inter alia</u>, that Li
had a "cognitive impairment."  First Unum submitted Dr. van
Gorp's report to Dr. Spica to opine on whether the testing done
by Dr. van Gorp was valid and the level of cognitive impairment
it demonstrated, among other things.  Dr. Spica discussed Dr.
van Gorp's report in some detail, noting that the testing did
not exhibit consistent evidence of neurocognitive dysfunction
rising to the level of impairment and, "appropriately, Dr. van
Gorp did not provide a Cognitive Disorder diagnosis."  As to Dr.
Spica's reference to Li's performances on some of Dr. van Gorp's
tests as being "well within normal limits," that is what Dr. van
Gorp's report reflects.  Finally, Dr. Spica described Li's
failures on "multiple indices" aimed at assessing validity of
the examination as results that "may" indicate symptom
magnification or malingering.  Li has not shown that Dr. Spica's
professional opinion regarding the validity of the test results
was contrary to the factual record.

Fourth, Li argues that First Unum acted arbitrarily because
it did not address the risks of self-harm associated with Li's
condition.  The issue of self-harm was first raised by Dr. van
Gorp in a December 2022 evaluation, and later in letters from

Dr. Zhang, all of which were materials submitted during the appeal process.  The record contains no evidence that Dr. Zhang considered Li at risk of self-harm during the elimination period.  It is not reflected in Dr. Zhang's treatment notes, in her management of Li during the elimination period, or in Li's application for benefits.  Dr. Brown and Dr. Spica reviewed material that Li submitted on appeal that contained references to Li's risk of harm and stood by their assessments that Li was not disabled within the meaning of the Plan.  First Unum was not required, as Li suggests, to go further.

Finally, in his reply brief, Li advances only one argument as to why First Unum's determination was arbitrary and capricious: in his view, it was "unreasonable" for First Unum "to ignore the opinions of all qualified medical professionals who . . . examined [Li]," instead siding with First Unum's non-treating physicians.  This follows from his broader argument in his opening brief that the Court should, in exercising de novo review, "assign more weight to Li's treating psychiatrist," Dr. Zhang, and less to First Unum's "non-examining reviewers."

First Unum was not required, however, to "accord special weight" to any examining physician, including Li's treating physician, Dr. Zhang, provided that First Unum's decision was not arbitrary.  Nord, 538 U.S. at 834.  As discussed, First Unum

provided a reasoned explanation for discounting the opinions of
Dr. Zhang and the other physicians that examined Li.  Dr. Brown
and Dr. Spica offered detailed, substantive analysis of the
relevant record materials and of Li's condition based on those
materials.  Li has not shown that First Unum acted arbitrarily
when it relied on those peer reviewers' assessments and denied
Li's application for benefits.

>    III. Li Has Not Established Good Cause to Expand the
>          Record.

Li argues that this Court should consider evidence outside
that administrative record.  In an ERISA benefits dispute, "the
presumption is that judicial review is limited to the record in
front of the claims administrator unless the district court
finds good cause to consider additional evidence."  Muller v.
First Unum Life Ins. Co., 341 F.3d 119, 125 (2d Cir. 2003)
(citation omitted).  This is because "trial de novo on new
evidence would be inconsistent with reviewing the
administrator's decision about whether to grant the benefit."
Id. (citation omitted).  "A demonstrated conflict of interest in
the administrative reviewing body is an example of 'good cause'
warranting the introduction of additional evidence."  DeFelice
v. Am. Int'l Life Assur. Co. of New York, 112 F.3d 61, 67 (2d
Cir. 1997).

Li argues that good cause exists to admit certain records from June 2023 through July 2024, specifically updated medical records, an affidavit from Li, and an additional letter from Dr. Zhang.  Specifically, Li asserts that these records "factually contradict" First Unum's stance that Li's treatment plan was inconsistent with a severe psychiatric impairment.

Li has not shown that good cause exists to go beyond the administrative record.  First Unum gave Li "ample time to submit additional materials."  Muller, 341 F.3d at 119.  And First Unum analyzed and responded to those materials in a reasoned manner that is supported by substantial evidence.  There is no basis to depart from the traditional presumption of limiting review to the administrative record as it existed when First Unum made its decision on appeal.

### Conclusion

The Clerk of Court is directed to enter judgment for First Unum and to close the case.

Dated:   New York, New York
         January 29, 2025

DENISE COTE
United States District Judge